## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SIDNEY L. WALKER,

    Plaintiff,

    v.

GORDON R. ENGLAND, Secretary of the
Department of the Navy,

    Defendant.

Civil Action No. 02-1695 (CKK)

## MEMORANDUM OPINION
(December 15, 2008)

Plaintiff Sidney L. Walker ("Walker"), an African-American male who was formerly employed at the Navy Public Works Center ("NPWC") in Washington, D.C., filed this suit against Defendant Gordon R. England in his official capacity as Secretary of the Navy, alleging various claims of employment discrimination and retaliation in violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*  This is not the first suit between these parties.  In the course of his employment at NPWC, Walker filed numerous administrative complaints and three prior lawsuits alleging various discriminatory employment actions, all of which were settled by the parties in May 2000.  The instant lawsuit involves claims arising after the parties' settlement.

Following the Court's Order and Memorandum Opinion granting in part and denying in part Defendant's Motion to Dismiss in this case, four claims remain:  (1) discrimination and retaliation based on Walker's non-selection for a Mechanical Engineering Technician position; (2) retaliation based on Walker's supervisors having denied him overtime work; (3) retaliation based on the rejection of Walker's application to a Leadership Development Initiative Program;

and (4) retaliation based on Walker's non-selection for an Electronic Industrial Controls

Mechanic Supervisor position.[1]  Defendant has filed a [54] Motion for Summary Judgment on

the four remaining claims, which Walker has opposed.

After thoroughly reviewing all of the parties' submissions, including the attachments

thereto, applicable case law and statutory authority, and the entire record of the case as a whole,

the Court shall GRANT-IN-PART Defendant's Motion for Summary Judgment as to Walker's

retaliation claims based on the Leadership Development Initiative Program and non-selection for

an Electronic Industrial Controls Mechanic Supervisor position (claims 3 and 4 above), and

DENY-IN-PART Defendant's Motion for Summary Judgment as to Walker's discrimination and

retaliation claim based on his non-selection for a Mechanical Engineering Technician position

and retaliation claim based on Walker's supervisors having denied him overtime work (claims 1

and 2 above), for the reasons that follow.

## I.  BACKGROUND

A.     *Factual Background*

Walker began his employment with NPWC in 1991.[2]  Pl.'s Stmt. ¶ 2(a).  He filed his first

---

[1] Walker's Second Amended Complaint, filed after the Court's resolution of Defendant's
Motion to Dismiss, also includes a retaliation claim alleging that Walker's supervisor refused to
provide Walker with a particular type of certification ("JCAHO Certification").  *See* Am. Compl.
¶ 12(d).  Because Walker was terminated from his employment following a Reduction-In-Force
("RIF") in May 2005, and because he sought only equitable relief if he prevailed on that claim,
Walker acknowledges that the claim "is now moot."  Pl.'s Opp'n at 20.

[2] As a preliminary matter, the Court notes that it strictly adheres to the text of Local Civil
Rule 7(h)(1) (formerly 56.1 when resolving motions for summary judgment).  *See Burke v.
Gould*, 286 F.3d 513, 519 (D.C. Cir. 2002) (district courts need to invoke Local Civil Rule 56.1
before applying it to the case).  The Court has repeatedly advised the parties that it strictly
adheres to Rule 7(h) and has stated that it "assumes that facts identified by the moving party in its
statement of material facts are admitted, unless such a fact is controverted in the statement of

EEO complaint against Defendant in 1993, alleging that he was not selected for two positions to which he had applied because of racial discrimination.[3]  *Id.* ¶ 2(b).  These allegations were heard by an Administrative Law Judge who, in 1995, determined that Defendant had racially discriminated against Walker by not selecting him for one of the two positions.  *Id.* ¶ 2(c).  On December 22, 1995, the Deputy Assistant Secretary of the Navy issued a final agency decision accepting the conclusions of the Administrative Law Judge and agreeing to certain "make whole" relief that included a promotion to a position that was substantially similar to the one that Walker was discriminatorily denied.  *Id.* ¶ 2(d); Pl.'s Opp'n, Ex. 4 at 2 (12/22/95 Letter from D. Meletike to S. Walker).

Defendant failed to place Walker in a substantially similar position and took other actions that Walker alleged were discriminatory and retaliatory.  Pl.'s Stmt. ¶¶ 2(e), 2(f).  These actions led Walker to file three separate lawsuits in this Court.  *Id.* ¶ 2(g).  On September 10, 1998, Judge Harold H. Greene held a hearing and issued an order finding that "the Secretary has failed to promote Mr. Walker to a position that is substantially similar to the position he was denied [and] the Secretary has failed to remedy the Navy's discrimination against Mr. Walker."  Pl.'s Opp'n, Ex. 5 at 1-2 (9/10/98 Order).  Judge Greene ordered the Commanding Officer of NPWC

---

genuine issues filed in opposition to the motion."  [51] Order at 2 (Nov. 7, 2005).  Thus, in most instances the Court shall cite only to Plaintiff's Statement of Material Facts ("Pl.'s Stmt.") or Defendant's Statement of Material Facts ("Def.'s Stmt.") unless a statement is contradicted by the opposing party.  Where a party objects to relevant aspects of an opposing party's proffered material fact, the Court shall cite to Plaintiff's Response to Def.'s Stmt. ("Pl.'s Resp. Stmt.") or Defendant's Response to Pl.'s Stmt. ("Def.'s Resp. Stmt."), as necessary.  The Court shall also cite directly to evidence in the record, where appropriate.

[3] Defendant does not dispute Walker's proffered facts concerning his prior EEO-related activities but instead makes the unsupported and erroneous assertion that the facts are immaterial. The Court shall therefore treat them as undisputed pursuant to Local Civil Rule 7(h)(1).

to place Walker "in an employment position that is substantially similar to the Maintenance Supervisor position as it existed at the time of the discrimination," and further ordered the Secretary to "provide [the] Court with the name of the Commanding Officer responsible for implementing and ensuring compliance with this Order." *Id.* at 2.

Judge Greene's hearing and order gave rise to an article in the Washington Post titled "Navy Accused of Not Obeying Federal Order." Pl.'s Opp'n, Ex. 6 at 1 (12/11/98 Washington Post Article). The article featured a picture of Walker and a description of how Judge Greene "excoriated the Navy for failing to follow [the] Equal Employment Opportunities Commission order to give [Walker] a job equal to the one that he was illegally denied in 1993." *Id.* The article also described how Judge Greene "denounced the agency's behavior as 'an outrage,'" and how he "demanded that the Navy provide him with the name of the officer responsible for implementing the EEOC order 'so [he] know[s] whom to put in jail.'" *Id.* After subsequent court proceedings related to Walker's lawsuits, the parties reached a court-approved monetary settlement on May 12, 2000. *Id.* ¶ 12(i).

Walker's discrimination complaints against Defendant became known to many of the persons employed at NPWC, in large measure because of the Washington Post article describing Judge Green's hearing and order. *Id.* ¶ 12(j). All twelve individuals working at NPWC who were deposed by Walker in this case testified that they had knowledge of Walker's complaints against Defendant or the Washington Post article, or both. *Id.* Several of the persons employed in the NPWC Maintenance Department even submitted declarations stating that Walker's discrimination complaints against Defendant were "a matter of common knowledge in the workplace." Pl.'s Opp'n, Ex. 10, ¶ 6 (Decl. of B. Pickens); *id.*, Ex. 11 ¶ 4 (Decl. of B. Chase)

(same); *id.*, Ex. 12 ¶ 4 (Decl. of F. Young) (same).

Against this backdrop, the Court sets forth the specific facts pertaining to each of Walker's four remaining claims.

1.     Non-Selection for Mechanical Engineering Technician Position

On May 8, 2001, Theron Houston, the Supervisory General Engineer, and John Verde, the Chief Engineer, approved a position description for a GS-11 Mechanical Engineering Technician position.  Def.'s Stmt. ¶ 3; Pl.'s Resp. Stmt. ¶ 3; Def.'s Mot., Ex. 12 at 113 (5/8/01 Position Description).  Because a lengthy description of the duties, responsibilities, and knowledge required for a GS-12 Mechanical Engineering Technician position already existed, Houston and Verde created a "Statement of Differences" to accompany the position description, explaining that the GS-11 position was "similar" to the GS-12 position but "requires more supervision and guidance" because it is a "training position."  Def.'s Stmt. ¶ 3 n.1; Pl.'s Resp. Stmt. ¶ 3; Def.'s Mot., Ex. 12 at 114 (Statement of Differences).

Verde acted as the selecting official for the new position, and he designated David Capozzoli, the Assistant Deputy Chief Engineer, as the evaluating official.  Def.'s Stmt. ¶ 6.  In the course of advertising the position and selecting applicants, Capozzoli and Verde decided to hire two applicants for the position at either the GS-11 or GS-12 level, or one of each.  *See* Def.'s Mot., Ex. 6 at 18:6 - 18:9 (Depo. Tr. of D. Capozzoli) ("Q: . . . How many positions were [g]oing to be filled with this?  A: We actually had enough work to justify two positions."); *id.* at 19:5 - 19:10 ("Q: Was there a decision made prior to the selection about whether the positions were going to be filled by like two GS-11s or two GS-12s or one of each or did it just depend on the qualifications?  A: It just depended on the qualifications.").

On May 29, 2001, NPWC posted the vacancy announcement, titled "Mechanical Engineering Technician (HVAC)." Def.'s Stmt. ¶ 7. The vacancy announcement described the duties of the position, including (among others) the ability to monitor and control "Heating and Air Conditioning and Ventilation systems" (*i.e.*, HVAC) and supervising and tracking "HVAC preventative maintenance checks." Def.'s Mot., Ex. 12 at 123 (5/29/01 Vacancy Announcement). According to the vacancy announcement, applicants would be ranked according to their knowledge, skills, and abilities corresponding to the following six evaluation criteria:

> 1. Knowledge of HVAC systems with direct digital control technology as used on military installations
> 2. Ability to manage two or more HVAC projects simultaneously
> 3. Knowledge of engineering contract administration
> 4. Knowledge of construction material and cost estimating practice
> 5. Knowledge of specification writing practices
> 6. Ability to communicate orally and in writing at all levels

*Id.*

Walker applied for the Mechanical Engineer Technician Position along with six other individuals. Def.'s Stmt. ¶ 9. All but one person were deemed eligible for the position. *Id.* Capozolli reviewed the eligible candidates using a crediting plan, assigning each applicant between one and four points for each of the six evaluation criteria (the higher the point total, the more qualified the candidate). *Id.* ¶ 10. *See also* Def.'s Mot., Ex. 12 at 237-49 (Mechanical Engineering Technician Crediting Plan). Three applicants, including William Schank, tied for the highest score of 18 points. Def.'s Mot., Ex. 12 at 250 (7/10/01 Scoring Sheet). George Altenbach had next highest score with 16 points. *Id.* Ross Fife received 15 points and Walker

received 13 points.[4]  *Id.*   Capozolli recommended to Verde that he select Schank as a GS-12 technician, *see* Pl.'s Opp'n, Ex. 33 at 1 (8/28/01 GS-12 Ranking Sheet), and select Altenbach as a GS-11 technician, *id.*, Ex. 32 at 1 (8/28/01 GS-11 Scoring Sheet).  Def.'s Stmt. ¶¶ 34, 36. Verde agreed with Capozolli's recommendations and selected Altenbach and Schank, two white males, for the two available positions.[5]  *Id.* ¶ 39.

As part of his evaluation process, Capozolli spoke with each of the applicants by phone or in person.  Def.'s Mot., Ex. 6 at 45:14 - 46:5 (Depo. Tr. of D. Capozolli) (". . . I remember evaluating the resumes and making phone calls . . . I don't know if the phone calls are really interviews or if they were just trying to get some questions to answer some of the things that weren't kind of clear on the resumes"); *id* at 51:1 - 51:13 ("since I knew [some of] them I might have talked to them personally, like had a face-to-face interview with them . . . I think I talked to two on the phone and one came by or one on the phone and two came by, I can't remember.  But they were in and out during that period while we were interviewing, I do remember that").  Defendant's Merit Promotion Procedures Manual authorizes a selecting official, such as Capozolli, to "interview none, any, or all of the certified candidates[,] but equity should be observed."  Pl.'s Opp'n, Ex. 25 at 24 (12/28/93 Merit Promotion Procedures Manual).  The facts and circumstances associated with Capozolli's interviews are a source of substantial dispute

_____

[4] A seventh individual, Harold Liller, received 12 points, but he was determined to be ineligible based on his lack of experience.  Def.'s Mot., Ex. 12 at 135 (List of Applicants); *id.* at 250 (7/10/01 Scoring Sheet).  It is unclear why Capozolli nevertheless ranked him.

[5] Capozolli did not recommend Ronald Wilkie for either technician position even though he tied Schank for the highest score of 18 points.  Wilkie is an African American male who was known to Capozolli because he worked in his department.  Def.'s Mot., Ex. 12 at 89 (EEO Decl. of D. Capozolli).

between the parties.

Capozolli claims that he interviewed Walker by phone.  Pl.'s Opp'n, Ex. 17 at 49:5 -

49:12 (Depo. Tr. of Capozolli) ("Q: When you say you called the applicants to ask them

questions for clarification, did you ask Mr. Walker any questions . . . A: I can't remember.  I'm

sure I asked him questions, I talked to him.  I asked him questions about his resume, but I can't

honestly recall what conversation we had").  Walker denies that Capozolli ever interviewed him:

> I received a call about the position from David Capozolli who asked if I was still
> interested in the position and said that I had an impressive resume and he would
> be calling me back.  However, there was never any substantive discussion or
> return call.  I was never interviewed in person or over the telephone by Capozolli.

*See* Pl.'s Opp'n, Ex. 1 ¶ 15 (Affid. of S. Walker).  Capozolli possesses no recollection of what he

believes he may have discussed with Walker.  *See* Pl.'s Opp'n, Ex. 17 at 67:15 - 67:18 ("Q: So

sitting here now you can't remember what you may have asked Sidney Walker about his

application?  A: No.  I can't remember that.").

Beyond their threshold dispute as to whether Capozolli interviewed Walker, there is

conflicting evidence in the record concerning the significance of the interviews.  Capozolli

testified that he might have ranked the candidates *before* interviewing them.  *Id.* at 46:1 - 46: 5

(Depo. Tr. of D. Capozolli) ("I can't remember if I ranked them and then called them or called

them and then sat down and went through the resumes and ranked them.").  There is other

evidence in the record, however, suggesting that Capozolli took the interviews into account

during his evaluation of the applicants.  In particular, the sixth evaluation criteria required

evaluation of a candidate's ability to communicate orally.  *See* Def.'s Mot., Ex. 12 at 123

(5/29/01 Vacancy Announcement).  Capozolli awarded Schank and Altenbach 3 points each for

criteria six because they "spoke clearly during [their] telephone conversation[s]." *Id.*, Ex. 16 ¶¶ 6, 7 (Decl. of D. Capozolli).  With respect to Walker's communication abilities, Capozolli awarded Walker 2 points because he "didn't speak very clearly" and was "just kind of hard to understand." *Id.*, Ex. 6 at 96:3 - 96:9 (Depo. Tr. of D. Capozzoli).  Capozolli also recalls that he "had to ask [Walker] to repeat his statements several times," even though he testified that he has no recollection of what he and Walker discussed, including (apparently) the statements that were allegedly repeated several times. *Id.*, Ex. 16 ¶ 9 (Decl. of D. Capozolli).

Capozolli also testified that his conversations with the applicants were not really interviews because they were simply his way of clarifying aspects of their resumes and applications.  *See* Pl.'s Opp'n, Ex. 17 at 45:18 - 45:21 (Depo. Tr. of Capozzoli) ("I don't know if the phone calls are really interviews or if they were just trying to get some questions to answer some of the things that weren't kind of clear on the resumes").  There is substantial evidence in the record, however, that such clarifications (or lack thereof) were material to Capozolli's scoring.  For example, Capozolli conceded that Walker's application "contained some well-written narratives regarding his experiences," but he also stated that portions of Walker's application were unclear.  *See, e.g.*, Def.'s Mot., Ex. 16 ¶ 9 (Decl. of D. Capozolli) ("a significant portion of [Walker's] application consisted of long lists or [sic] experiences and he did not provide any detail our [sic] explain how they applied to the position").  This lack of clarity apparently affected Capozolli's scoring of the first and second evaluation criteria (relating to knowledge of HVAC systems and the ability to manage two or more HVAC projects simultaneously).  *See* Def.'s Mot., Ex. 12 at 123 (5/29/01 Vacancy Announcement).  Altenbach received scores of 4 and 3 on criteria one and two, respectively, whereas Walker received scores

of 2 and 2, respectively.  *See* Pl.'s Opp'n, Ex. 31 (7/10/01 Scoring Sheet).[6]  Walker asserts that

he should have received higher scores for these two evaluation criteria because his application

> contained a lengthy list of HVAC equipment and controls about which he was
> knowledgeable, and the fact that he supervised a multi-trade department,
> including six HVAC mechanics, as a Maintenance Supervisor for the NPWC and
> worked with heating and ventilation systems for the Army Corps of Engineers.

Pl.'s Stmt. ¶ 1(j).  Defendant asserts that Walker's description of his HVAC-related knowledge

and experience was not clear from his resume.  *See* Def.'s Resp. Stmt. ¶ 1(j).  Even if Capozolli's

interviews were meant only to clarify the qualifications of the applicants, an alleged failure to

interview Walker may have had a substantial effect on his HVAC-related scores.

The Court also notes that Defendant's explanation for why Walker's application was

unclear is also subject to dispute.  Defendant asserts that Walker's application contained

"grammatical errors" (which it does not identify) and "the description of his knowledge, skills,

and abilities did not correspond to the evaluation factors in the vacancy announcement."  Def.'s

Stmt. ¶ 32.  Walker disputes that his application contained any more grammatical errors than any

of the other applications for the position.  *See* Pl.'s Resp. Stmt. ¶ 32.  Walker also disputes that

the organization of his application was problematic because Schank's application was not

organized to correspond to the six evaluation criteria, and Schank tied two others for the highest

score.  *Id.*  Paradoxically, Capozolli described Schank's application as "very organized."  Def.'s

---

[6] The Court notes that the parties have various disputes concerning how best to
characterize Altenbach's HVAC experiences.  For example, Defendant asserts that Altenbach
had more than thirty years of experience working with sheet metal and HVAC systems.  Def.'s
Stmt. ¶ 15.  According to Plaintiff, Altenbach's application suggests that he worked for 23 of
those 30 years as a "journeyman sheet metal mechanic."  Pl.'s Resp. Stmt. ¶ 15.  These and other
minor distinctions concerning Altenbach's qualifications are not relevant to the disposition of
Defendant's Motion for Summary Judgment.

Mot., Ex. 16 ¶ 7 (Decl. of D. Capozolli).  Moreover, Walker explains that "there is no requirement that an applicant address each of the [evaluation criteria] . . . individually," a point that Defendant does not dispute.  *See* Pl.'s Resp. Stmt. ¶ 32.

In terms of Capozolli's knowledge of the applicants, he claimed that he did not know Walker's race during the evaluation process.  *Id.*, Ex. 12 at 89 (EEO Decl. of D. Capozolli).  There is substantial evidence to the contrary.  During Capozolli's deposition in this case, he testified that when he spoke to Walker on the telephone he "could tell from his [Walker's] voice that he was a black guy."  *Id.*, Ex. 17 at 54:13 - 54:15 (Decl. of D. Capozolli).  Capozolli also acknowledged reading the 1998 Washington Post article that described Walker's allegations of race discrimination, even though he denied recalling the picture of Walker in the article.  *See* Pl.'s Opp'n, Ex. 17 at 38:3 - 38:15 (". . . I seem to recall an article, I don't seem to recall a picture in the article.  Whether I read it kind of like this [a printed copy], as an e-mail or whether I just picked up the paper and read it, I can't even remember anymore").[7]

Finally, the Court notes that the parties' briefs focus on two other factual disputes that, unlike the ones above, are not material to disposition of Defendant's Motion for Summary Judgment.  First, Walker repeatedly emphasizes that Capozolli's focus on HVAC knowledge when ranking the candidates was inappropriate because the Statement of Differences did not mention HVAC knowledge and the position description for the GS-12 technician position did not specifically reference knowledge of HVAC systems in its "knowledge required" section.  *See,*

---

[7] Capozolli knew Schank because he worked in his department, *see* Def.'s Mot., Ex. 12 at 89 (EEO Decl. of D. Capozolli), and he knew Altenbach's race because he interviewed him in person prior to making his recommendations to Verde, Def.'s Mot., Ex. 6 at 46:6 - 46:22 (Depo. Tr. Of D. Capozolli).

*e.g.*, Pl.'s Resp. Stmt. ¶ 10.  Walker's emphasis on this narrow point is misleading.  There is no dispute that HVAC knowledge was identified in the "major duties and responsibilities" portion of the GS-12 position description.  *See* Def.'s Mot., Ex. 12 at 116-121 (GS-12 Mechanical Engineer Technician Position Description) (explaining that the position requires the employee to "[m]onitor[] and control[] Hearing and Air Conditioning and Ventilation (HVAC) systems utilizing direct digital control technology").  There is similarly no dispute that the vacancy announcement emphasized that HVAC knowledge was required for the position by (1) titling the position "Mechanical Engineering Technician (HVAC)," (2) describing HVAC activities in the "duties of this position" section, and (3) explaining that two of the six criteria as to which applicants would be ranked would pertain to their knowledge and abilities related to HVAC systems and projects.  *Id.* at 123 (5/29/01 Vacancy Announcement).  Thus, consideration of HVAC knowledge was fully disclosed to putative applicants as an appropriate area of evaluation.[8]

Second, Walker argues that Capozolli improperly selected Schank as a "non-competitive eligible" candidate, *see* Pl.'s Opp'n, Ex. 33 (8/21/01 GS-12 Ranking Sheet), a designation that allows an evaluator to select a candidate for one of several reasons that fall outside the ordinary merit promotion plan process.  *See* 5 C.F.R. § 335.103.  Walker claims that Schank's designation as a non-competitive eligible was in error because "he did not qualify as a non-competitive

---

[8] The D.C. Circuit has rejected the notion that reliance on a non-enumerated factor that is encompassed within a more general description gives rise to an inference of discrimination.  *See Jackson v. Gonzales*, 496 F.3d 703, 709 (D.C. Cir. 2007) ("[W]e are aware of no previous case from this or any other circuit suggesting that an employee gets past summary judgment simply by showing that a factor in the hiring decision was not expressly listed in the job description when the factor was encompassed by the job description.").

candidate under the requirements of [D]efendant's Merit Promotion Program and OPM regulations." Pl.'s Stmt. ¶ 1(g) (citations omitted). Walker's assertion is both immaterial and unfounded. Schank was ranked along with all of the other candidates and received a total of 18 points. Thus, whether he was selected as a competitive or non-competitive eligible candidate is immaterial to whether he was properly selected instead of Walker, as it would have been appropriate to select him ahead of Walker in either scenario. Furthermore, Walker's assertion is based on a report prepared by David C. Knudsen, a personnel management consultant, who reviewed the scoring sheets used by Capozolli and concluded that Schank should not have been considered a non-competitive candidate because his application did not show experience at the "grade 12 level," citing 5 C.F.R. 335.103. *See* Pl.'s Opp'n, Ex. 26 at 1 (3/9/05 Statement of Opinions). Knudsen failed to consider (or even identify) Schank's experience, listed in his application, at the WS-12 level (while working as a Project Test Director at the Philadelphia Naval Shipyard) and WG-13 level (while working as a Mechanical Inspector at the same location). *See* Def.'s Mot., Ex. 12 at 141, 143 (W. Schank Application). Knudsen provides no explanation for why this experience would not allow Capozolli to appropriately designate Schank as a non-competitive eligible candidate under 5 C.F.R. 335.103.[9]

---

[9] The Court notes that Walker raises certain other facts in his briefs that are unsupported by the record and do not require extended discussion. For example, according to Walker, Capozolli stated in his deposition that he conducted an interview with George Altenbach in the presence of Theron Houston, when, in fact, he didn't. In actuality, Capozolli stated that he did not remember if others were present during his interview with George Altenbach, but "[i]f I did it would have been Theron Houston, but I can't remember." Def.'s Resp. Stmt. ¶ 1(c) (quoting Pl.'s Opp'n, Ex. 17 at 47:1 - 47:5). Similarly, Walker emphasizes that Capozolli told the EEO investigator that the Personnel Office rated the candidates. Pl.'s Stmt. ¶ 1(b). Once the EEO investigator presented Capozolli with the scoring sheet, however, he recalled that he had performed the rankings himself and indicated as much. Def.'s Resp. Stmt. ¶ 1(b).

2.    Overtime

Employees at NPWC earn overtime pay for overtime work.  Def.'s Stmt. ¶ 49.  NPWC's

overtime policy instructs that overtime must be "limited to urgent customer readiness,

emergencies, safeguarding life and property, and an incidence where savings can be clearly

demonstrated by the use of overtime."  Id. ¶ 50.  The collective bargaining agreement with the

Washington Area Metal Trades Council prohibits the assignment of overtime to supervisors for

work normally performed by union members if those employees are available.  Id.  Although the

parties agree that these policy instructions exist, they have vastly different views as to whether

and to what extent these policies have been followed.

Walker's supervisors, Albert Loften and Joseph Compofelice, testified that approval of

overtime for supervisors was not permitted unless their supervision was necessary "(1) for large

projects, such as the 'Specifics' projects performed by Code 580; (2) it was required or justified

by the customer; or (3) if the supervisor directly performed the work."  Id. ¶ 51.  Although

Compofelice testified that Defendant was approved to work overtime on one large project,

Defendant contends that Walker was generally not assigned overtime because "[o]n the whole,

[Walker's] unit performed tasks that did not necessitate overtime for the supervisors."  Def.'s

Stmt. ¶¶ 52, 53.  In particular, Defendant asserts that Walker's unit performed "emergency and

service tickets" for small projects, and that "the Agency's customers would not authorize

overtime for a supervisor's presence."  Id. ¶ 53.  In contrast, Defendant asserts that Code 580, a

department that performed large projects, entailed a lot of supervisory overtime work.  Id. ¶ 54.

Walker has a much different view.  First, he notes that his overtime work had to be

approved by his supervisors, Loften or Compofelice, Pl.'s Stmt. ¶ 4(a), and that Loften testified

that he was unfamiliar with the NPWC overtime policy instruction cited above.  *See* Pl.'s Opp'n, Ex. 14 at 42:6 - 42:22 (Depo. Tr. of A. Loften) ("Q: Do you recognize this [instruction?] A: Not really.  Q: You've never seen this [instruction] before?  A: I can't recall.").

Second, Walker explains that both Loften and Compofelice were outwardly hostile toward him and other African Americans in general.  Defendant does not dispute that Loften told Walker, prior to a reduction in workforce that resulted in Walker's termination, that

> he was glad he wouldn't have to see Walker anymore, that Walker shouldn't have been a Maintenance Supervisor, that the only way he could get advances was through the court system, and that if it was up to Loften, Walker would be sent back to Mississippi.

Pl.'s Stmt. ¶ 2(k); Def.'s Resp. Stmt. ¶ 2(k) (stating only that Loften made these statements after he no longer was supervising Walker).  Defendant also does not dispute that Compofelice maintained a notebook that he used to document Walker's use of leave (but no other employees), even though Walker never exceeded his annual leave.  *Id.* ¶ 2(l); Def.'s Resp. Stmt. ¶ 2(l) (stating this fact is irrelevant and/or does not constitute an adverse employment action).

Walker also submitted declarations from other individuals who were employed in Walker's Maintenance Department who observed Loften and Compofelice's treatment of Walker.  These employees stated that Loften and Compofelice would

> frequently give work assignments directly to Felix Mulder, a Work Leader who worked under Mr. Walker, rather than giving them to Mr. Walker to assign to his Work Leaders as should have been the case, and as was the practice with other supervisors.

Pl.'s Opp'n, Ex. 8 ¶ 9 (Decl. of L. Gray).  *See also id.*, Ex. 9 ¶ 7 (Decl. of C. Long) (same); Ex. 10 ¶ 7 (Decl. of B. Pickens) (same); *id.*, Ex. 11 ¶  8 (Decl. of B. Chase) (same); *id.*, Ex. 12 ¶ 7 (Decl. of F. Young) (same).  Similarly, Loften would give "performance evaluation forms

15

directly to Mr. Walker's men instead of allowing Mr. Walker to meet with the men and give

them their evaluations like the other supervisors did." *Id.*, Ex. 9 ¶ 8 (Decl. of C. Long).  Loften

and Compofelice would speak to Walker "in a condescending tone like he was a child," *id.*, Ex.

10 ¶ 6 (Decl. of C. Long), and "would frequently check on Mr. Walker's whereabouts and the

progress of his jobs, much more than they did for the other supervisors." *Id.*, Ex. 8 ¶ 8.  They

would also require "Walker to stay until the very end of the workday no matter how early he

came in, while other supervisors were allowed to leave early." *Id.*  Regarding overtime work,

Colie Long, a Work Leader in the North Zone of the NPWC Maintenance Department, stated that

"Walker's men worked lots of overtime, [but] Mr. Loften and Mr. Compofelice generally would

not allow him to work overtime").

These employees also explained that Loften and Compofelice generally treated African

American employees in the Maintenance Department differently than white employees:

> I observed that black employees were disciplined for things that were ignored for
> white employees, and white employees were allowed to leave early, but not blacks
> . . . [and] Loften [made] derogatory comments about blacks even though he
> himself is black.

*Id.*, Ex. 8 ¶ 7 (Decl. of L. Gray).

> I observed that blacks were treated differently than whites. For example, white
> employees would stand around outside the building talking and smoking and not
> only was nothing said to them, but Mr. Loften or Mr. Compofelice would
> sometimes be with them.  However, when blacks would do that, Mr. Loften or
> Mr. Compofelice would tell them to get back to work or they would call the
> supervisors of the black employees and tell them to get the black employees back
> to work.

*Id.*, Ex. 9 ¶ 4 (Decl. of C. Long).

> I observed that blacks were treated differently than whites.  For example, black
> employees were disciplined for things that were ignored for white employees.

16

> Blacks were told not to have chairs in the 'cages' where we kept our tools, but whites were allowed to have them.

*Id.*, Ex. 11 ¶ 6 (Decl. of B. Chase).

> I observed that blacks were treated differently than whites.  For example, white employees would stand around outside the [sic] on the loading dock talking and smoking and not only was nothing said to them, but Joe Compofelice, the assistant to North Zone Manager Al Loften, would sometimes be out there smoking and talking with them.  However, when blacks would do that, Mr. Compofelice would tell them to get back to work.

*Id.*, Ex. 12 ¶ 6 (Decl. of F. Young).[10]

With respect to Walker's overtime claim specifically, there is substantial evidence in the record that conflicts with the explanation for why Walker was not approved for more overtime by Loften and Compofelice.  For example, as reflected above, Compofelice testified that he refused Walker's overtime requests because Compofelice did not believe it was appropriate for a supervisor to perform the work of his employees.  *See* Pl.'s Opp'n, Ex. 13 at 32:2 - 32:6 (Depo. Tr. of J. Compofelice) ("I told Mr. Loften I didn't feel it was deem-able [sic] for a Supervisor to perform overtime when he had sufficient men to do the work.").  Loften agreed with him.  *Id.* at 32:5 - 32:6.  According to the overtime records for the period between August 18, 2003 and May 18, 2005, however, Compofelice himself had 351 hours of overtime.  *Id.*  These overtime hours included activities such as "snow removal," "power wash planters," and "replacing light fixtures."  *Id.*  Two other maintenance supervisors, William Felix and Melvin Thomas, had 196 and 263 hours of overtime, respectively.  *Id.*  Defendant maintains that these other supervisors had different positions and responsibilities so they are not comparable to Walker.  Def.'s Resp.

_____

[10] Defendant does not dispute these declarations but maintains that they are general and conclusory.  *See* Def.'s Resp. Stmt. ¶ 2(m).

Stmt. ¶ 4(c).  Although Defendant also asserts that the collective bargaining agreement

"mandated that supervisors not be assigned overtime work normally performed by the union

members if they are available," *Id.* ¶ 4(g), Defendant also argues (in contradiction to itself) that

Felix, a supervisor, appropriately billed overtime electrical work because "he performed direct

work, not supervisory work., " *id.* ¶ 4(h).

Walker also explains that there was a "call-back" list for emergency service calls that

constituted overtime work.  *See* Pl.'s Stmt. ¶ 2(d).  This list contained sub-lists of persons who

were to be called depending on the nature of the job (*e.g.*, HVAC, plumbing, electrical, etc.).  *See*

Pl.'s Opp'n, Ex. 42 (Call-Back List).  The priority list for HVAC problems included both

Compofelice and Loften, as well as persons who worked for Walker, but not Walker himself.  *Id.*

The lists for plumbing and medical gas problems also included Walker's subordinates, but not

Walker.  *Id.*  For electrical problems, however, the first name on the priority list was Felix, the

supervisor of that department.  *Id.*  Defendant does not directly dispute these facts but suggests

simply that Walker "was not excluded from the call back list."  Def.'s Resp. Stmt. ¶ 4(d).

During Compofelice's deposition in this case, he testified that Felix was listed as the first

name on the call back list for electrical problems in his department because he lived close to the

facility:

> Bill Felix, basically the only overtime he would get is on a call back, after hour
> calls because he was only like ten minutes from the place, everybody else lived
> either in Virginia, West Virginia, even a couple of [people] lived in Pennsylvania.

Pl.'s Opp'n, Ex. 13 at 26:2 - 26:7 (Depo. Tr. of J. Compofelice).  Although the record is unclear

as to whether Compofelice knew where Walker was residing, Walker also lived in Maryland, and

contends that it is "just as close as Felix."  Pl.'s Stmt. ¶ 4(f).  *See also* Pl.'s Reply, Ex. 12 at 4:12

- 4:13 (Depo. Tr. of S. Walker) (stating that he resided in Gaithersburg, Maryland).  In any event,

as a result of the overtime approval practices of Loften and Compofelice, Walker's subordinates

accumulated substantial overtime.  For example, Felix Mulder billed 1,122 hours and Barry

Varnell had 830 hours, while during the same period Walker only billed 114 hours.  Pl.'s Stmt. ¶

4(g).

Finally, certain employees were approved to perform operating room renovation overtime

work, but Walker was not among them.  Compofelice testified that this work was performed by

the "structural shop" and its employees, and work involving Walker's group could be performed

during normal business hours.  *See* Pl.'s Opp'n, Ex. 13 at 35:8 - 36:17 (Depo Tr. of J.

Compofelice).  However, Walker's subordinates had a substantial number of overtime hours for

the operating room renovations.  Pl.'s Stmt. ¶ 4(h).  Defendant maintains only that Walker

"provides no evidence to support his assertion that he was entitled to receive overtime with

respect to renovation work."  Def.'s Resp. Stmt. ¶ 4(h).

### 3.     Leadership Development Initiative Program

In early 2001, the Naval Facilities Engineering Command advertised a Leadership

Development Initiative Program ("LDI Program") designed to

> identify and provide for the development of incumbent and prospective
> executives, managers, and supervisors, to maintain and enhance their
> effectiveness; to ensure the availability of competent and skilled candidates to
> meet future staffing requirements; and to foster technology transfer and shared
> learning throughout the command.

Pl's Opp'n, Ex. 43 at 1 (2/6/2001 LDI Program Announcement); *see also* Pl.'s Opp'n, Ex. 44 at

7:5 - 7:7 (Depo. Tr. of L. Heckathorn) (explaining that the purpose of the LDI program is "[t]o

train new leaders").  Individuals who were interested in participating in the program could apply

19

by submitting an application between February 13, 2001 through March 30, 2001. Def.'s Stmt. ¶

41. The LDI Program Handbook explicitly stated that late or incomplete packages would not be

considered. *Id.* ¶¶ 42, 43. *See also* Pl.'s Opp'n, Ex. 43 at B-3 (LDI Program Handbook) ("LATE

OR INCOMPLETE PACKAGES WILL NOT BE CONSIDERED. APPLICATIONS MUST BE

**RECEIVED** BY THE CLOSING DATE") (emphasis in original). Each application had to

include the following components to be considered complete:

> 1. Self-nomination form
> 2. Resume
> 3. Verification of Eligibility form
> 4. Supplemental information of no more than two single-sided typed pages
> 5. Defense Acquisition Workforce Improvement Act form
> 6. A copy of the most recent SF-50

Def.'s Stmt. ¶ 42.

The individual who was responsible for overseeing the LDI application process during the

2001 application period was Leo Heckathorn. *Id.* ¶ 44. At the time he reviewed the LDI

Program applications, Heckathorn did not know Walker's race or have knowledge of his EEO-

protected activity. *See* Def. Mot., Ex. 17 at 54 (EEO Affidavit of L. Heckathorn) ("At the time

that I reviewed Mr. Walker's application, I did not know that he had been involved in prior EEO

activity" and "I did not know [Walker's] . . . race before I saw [his] application"); *Id.*, Ex. 31 at

29:20 - 29:21 (Depo. Tr. of L. Heckathorn) ("Q: Did you know [Walker] then, at that time? A:

At that time I didn't know who he was.").

Walker submitted his application prior to the March 31, 2001 deadline, but failed to

include a signed Verification of Eligibility form as was required for a complete application. *Id.*

¶¶ 45, 46. Having discovered Walker's incomplete application, Heckathorn sought guidance

from Clarence Wenzel, the individual who oversaw the application process during the previous year, as to whether he could accept Walker's application.  *Id.* ¶ 47.  Wenzel informed Heckathorn that George Altenbach's application was denied the previous year because he failed to include a signed Verification of Eligibility form (the same form missing from Walker's application).  *Id.* Hecathorn also testified that Wenzel mentioned Walker's previous EEO complaints toward the end of their conversation:

> Q: When you talked to Mr. Wenzel, did he ever mention anything about Mr. Walker's discrimination complaints from the previous time?

> A: At the end of our conversation, just as I was walking out the door he says you know he's had other problems and I said okay, well, that's fine.  The decision had already been made because of precedents that we were going to do this.

> Q: Did he use the word "problems"?

> * * *

> A: . . . He might have said EEO, but I don't remember exactly what he said.

Pl.'s Opp'n, Ex. 44 at 32:5 - 32:18 (Depo. Tr. of L. Hechathorn).

Wenzel described this conversation with Heckathorn in an EEO Affidavit and stated that Heckathorn did not tell him who the applicant was that they were discussing – a fact that was contradicted by Heckathorn's deposition testimony.  *See* Pl.'s Opp'n, Ex. 45 at 2 (EEO Affid. of C. Wenzel).  Nevertheless, Wenzel also stated that "[i]t is an automatic reject if something is missing from the [LDI] package" and that  "[he has] not extended the time to allow an applicant to obtain [a] signature on the verification [form].  There are no extensions."  *Id.* at 2-3.   Wenzel also confirmed that "Mr. Altenbach was rejected that [sic] the same Administrative step.  I did not see his application . . . I do not waste my time on incomplete packages."  *Id.*

21

Based on the guidance from Wenzel, and the explicit requirements contained in the LDI

Program Handbook, Heckathorn sent Walker a letter on April 3, 2001, rejecting his LDI

application because "[a]s part of the application the Verification of Eligibility must be complete.

The Verification of Eligibility in your package is not signed by the HRO representative."  Def.'s

Mot., Ex. 17 at 22 (4/3/01 Letter from L. Heckathorn to S. Walker).

Walker does not dispute the foregoing facts, but asserts that his failure to submit a signed

Verification of Eligibility form was not his fault.  Walker brought the form to the Bethesda

Human Resources Office on March 26, 2001, four days before the submission deadline.  Pl.'s

Stmt. ¶ 5(c).  He gave the form to Frances Myers, an African American woman who was

unaware of Walker's EEO activity, who worked as a personnel assistant at the Bethesda Satellite

Office of the Human Resources Office.  Id. ¶ 5(c); Pl.'s Opp'n, Ex. 49 at 1 (EEO Affidavit of F.

Myers).  Although Walker makes the unsupported assertion that she "told [Walker] she would

fax it to the HRO at the Washington Navy Yard for a signature," the evidence in the record is that

Ms. Myers faxed it to someone named Faith Richardson at a different human resources office and

did not contact the office at the Navy Yard:

> I had spoken to Faith Richardson at HRSC on Nebraska Avenue and she said that
> she took care of the LDI program so I faxed Mr. Walker's verification form to her
> . . . I was trying to help them [sic] because I did not know who was handling the
> LDI verification for eligibility forms.  I thought that Mr. Walker's form had been
> filled out and given to Mr. Walker in time for the deadline for the LDI program.  I
> did not call HRO-W at the Navy Yard.

Pl.'s Opp'n, Ex. 49 at 2 (EEO Affid. of F. Myers).  Walker states that he "checked back" on

March 30, 2001, and "was told that everything was OK," and that he did not learn until after the

application submission deadline that his Verification of Eligibility form had not been signed.

22

Pl.'s Stmt. ¶ 5(c).  Walker emphasizes that "the Human Resources Offices were aware of [his] prior discrimination case," and that one of his prior discrimination complaints against Defendant "involved the scoring of his application by Human Resources."  Pl.'s Stmt. ¶ 5(b).

Finally, Walker proffers two additional facts that seem to undermine his claim of retaliation associated with the rejection of his LDI Program application.  First, Walker explains that Larry Gray, Sr., another African American employee in the same department, was able to obtain a signed Verification of Eligibility form and was selected for the LDI program.  Pl.'s Stmt. ¶ 5(d).  Mr. Gray stated in an EEO affidavit that he noticed Walker's form was unsigned and advised him that he "thought his paperwork [would] be rejected because he did not get his verification form signed."  Pl.'s Opp'n, Ex. 50 at 2-3 (EEO Affid. of L. Gray).  Gray further stated that he was "persistent" in seeking to obtain the required signature while Walker "gave up" on Ms. Myers.  *Id.* at 2.  Second, Walker acknowledges that Altenbach had his application rejected the previous year because he also failed to obtain the necessary signature on his Verification of Eligibility form, but indicates that it "was due to his misunderstanding of the process, not because he had tried unsuccessfully to have [sic] signed like Walker did."  Pl.'s Stmt. ¶ 5(e).  As Defendant points out in response, the reasons for why each individual failed to obtain the required signature were irrelevant to the rejection of their applications; both were treated the same regardless of the reasons for their incomplete applications.  Def.'s Resp. Stmt. ¶ 5(e).

    4.    <u>Reduction in Workforce / Non-Selection for Electronic Industrial Controls Mechanic Supervisor Position</u>

From 2000 to 2004, the Engineering Field Activity Chesapeake performed a Commercial

Activity Study on NPWC.  Def.'s Stmt. ¶ 60.  One purpose of the study was to determine

whether NPWC should convert its entire Maintenance Department to a private-sector contract.

*Id.*  The study concluded that NPWC should do so.  *Id.* ¶ 61.  As a result, on August 13, 2004,

NPWC announced that it would abolish 334 positions using the federal government's reduction-

in-force ("RIF") procedures.  *Id.*  Pursuant to these procedures, Walker was issued a RIF notice

on November 29, 2004, indicating that he would be separated from the agency.  *Id.* ¶ 68.

Walker's final retaliation claim in this case arises as a result of, but is unrelated to, the

NPWC's RIF.[11]  After receiving his RIF notice, Walker applied for the position of Electronic

Industrial Controls Mechanic Supervisor in February or March 2005.  Pl.'s Opp'n, Ex. 1 ¶ 28

(Affid. of S. Walker); *id.*, Ex. 52 at 1-2 (Vacancy Announcement).  Walker was one of six

applicants who were initially considered unqualified for the position by Ms. Theresa Tiller, an

employee working at the human resources office in Washington, D.C.  *See* Def.'s Reply, Ex. 6 at

24 (3/11/05 Eligibility Register).  Ms. Tiller called Walker to explain her determination, as is her

usual practice, and she reversed her decision after Walker highlighted various portions of his

resume that qualified him for consideration:

> My policy is to call disapproved applicants to let them know that I disapproved
> them.  That gives them the opportunity to question the final result and in this case
> he [Walker] did bring up some issues.  We discussed his application and he
> pointed out a few things in there that I was able to use to determine him to be

---

[11] The Court notes that Walker also discusses evidence and/or attempts to raise another
retaliation claim based on his non-selection for a Facilities Management position.  *See* Pl.'s Stmt.
¶¶ 6(d).  This evidence and/or claim relies on statements made during settlement negotiations
between the parties.  Not only are such statements generally inadmissible pursuant to Federal
Rule of Civil Procedure 408, but Walker signed an agreement with Defendant providing that
such statements would "not be disclosed in any subsequent proceeding or document."  Def.'s
Reply, Ex. 4 at 1 (12/15/04 Agreement).  The Court shall therefore disregard Walker's discussion
of such evidence and any claim that Walker may have intended to raise.

basically qualified.

Pl.'s Opp'n, Ex. 46 at 21:12 - 21:19 (Depo. Tr. of T. Tiller).  As a result, Walker was evaluated

along with four other candidates for the position.  Def.'s Reply, Ex. 6 at 7 (Consolidated

Rankings Sheet).

The individuals who evaluated the candidates were David Capozolli (who had served as

the evaluating official for the Mechanical Engineering Technician position), along with Dennis

Walters.  *Id.* at 6 (3/18/05 Evaluation Description).  Capozolli and Walters ranked the candidates

separately and then combined their scores.  *Id.* at 8 (Individual Scoring Sheet).  John Presley

received the highest score with 38 points and Walker received the lowest score with 30 points.[12]

*Id.* at 7 (Consolidated Rankings Sheet).  Presley was selected for the position.  Pl.'s Stmt. ¶ 7(c).

Presley had been placed in a three to four-month temporary detail one year earlier for the

same position, but Walker believes that Presley lacked other high voltage or supervisory

experience.  *Id.* ¶ (c).  Walker asserts that "Presley's temporary promotion as the sole basis to

qualify him for selection violates [D]efendant's Merit Promotion Program which prohibits the

use of a temporary promotion for that purpose."  *Id.* ¶ 7(d).  Problematically, Walker cites no

support for the proposition that Capozolli and Walters viewed Presley's temporary detail as his

"sole" qualification.

In any event, Walker does not assert that his qualifications were superior to the other four

candidates.  *See* Pl.'s Opp'n, generally.  Capozolli testified that this supervisor position was most

appropriate for someone who had extensive experience working with utilities:

---

[12] The three candidates in between received point totals of 32.5, 31.5, and 31,
respectively.  *See* Pl.'s Reply, Ex. 6 at 7 (Consolidated Rankings Sheet).

> This position in Utilities is the senior person that understands utility systems, that
> understands the Boiler Plants, understands the Chiller Plants, the electrical
> systems, the water distribution systems, somebody that has had experience in
> Utilities for a long period of time [and] is most qualified to do this type of work.

Pl.'s Opp'n, Ex. 17 at 88:14 - 88:20 (Depo. Tr. of D. Capozolli).  As Walker concedes, Presley

worked as a Utility Systems Operator for most of his career.  *See* Pl.'s Stmt. ¶ 7(c).  Capozolli

did not believe Walker was qualified for the position based on his background.  *See* Pl.'s Opp'n,

Ex. 17 at 88:11 - 88:12 (Depo. Tr. of D. Capozolli).[13]

    *B.*    *Procedural Background*

    Walker filed his original Complaint on August 22, 2002.  Defendant filed an Answer on

November 13, 2002, along with a Motion to Dismiss.  Following completion of the parties'

briefing, the Court issued an Order and Memorandum Opinion on May 24, 2004, which

dismissed all of Walker's claims against Defendant with the exception of his non-selection for

the Mechanical Engineering Technician position (claim one), and Walker's claim regarding the

rejection of his application for the Leadership Development Initiative in 2001 (claim three).  *See*

[16] Mem. Op. at 1 - 12 (May 24, 2004).  The Court set a schedule for discovery and other

matters.  *See* [17] Scheduling Order (May 24, 2004).

    On June 7, 2004, Walker timely filed a Motion to Amend his Complaint to add retaliation

---

[13] Walker quotes Capozolli's statement that "you don't have to be a high voltage
electrician to manage high voltage electricians; you just need to have a background in that."  Pl.'s
Stmt. ¶ 7(f).  Walker argues that this quote is inconsistent with Capozolli's justification for
Altenbach's selection for the Mechanical Engineering Technician position, where Capozolli
indicated that he could not presume Walker knew about HVAC testing and balancing just
because he supervised HVAC mechanics.  The Court first notes that Walker cites to a page (Pl.'s
Opp'n, Ex. 17 at 99) that does not exist in the record submitted to the Court.  In any event,
Defendant explains that the position for which Presley was selected was a supervisory position,
whereas the Mechanical Engineering Technician position, for which Walker previously applied,
was not a supervising position.  Def.'s Resp. Stmt. ¶ 7(f).

claims based on Defendant's refusal to approve overtime time work for Walker (claim two), and

the failure to provide Walker with a particular certification (a claim that has since become moot

and is no longer at issue).  *See* Pl.'s Mot. to Amend at 1.  Walker's Motion acknowledged that he

had not raised these claims administratively prior to asserting them in an Amended Complaint,

but argued that "numerous cases in this Court and elsewhere have held that a plaintiff may bring

claims of retaliation for the first time in federal court without having to first present them to an

agency." *Id.* at 3; *see also id.* at 3-4 (collecting cases).  Pursuant to the Court's Scheduling and

Procedures Order, Defendant's Opposition was due no later than June 17, 2004.  No opposition

to Walker's Motion to Amend was filed.  The Court granted Walker's unopposed Motion to

Amend on June 29, 2004.

On February 9, 2005, Walker filed a Motion to Amend his First Amended Complaint that

added a retaliation claim based on Defendant's actions associated with the RIF (claim four).  *See*

Pl.'s Mot. to Amend First Am. Compl. at 1.  Similar to Walker's first Motion to Amend, this

motion again acknowledged that he had not exhausted his administrative remedies with respect

to this retaliation claim but argued that exhaustion was not required "for the reasons discussed in

plaintiff's previous Motion to Amend the Complaint." *Id.*  On February 18, 2005, Defendant

filed a response to Walker's Motion to Amend stating that "Defendant does not oppose

Plaintiff's request to amend his Complaint . . ." Def.'s Resp. to Pl.'s Mot. at 1.  The Court

granted Plaintiff's unopposed Motion to amend his First Amended Complaint on April 4, 2005.

Defendant failed to file an Answer to either of Walker's First or Second Amended Complaints.

Although discovery was originally set to close on December 31, 2004, the Court ordered

several extensions of that date as a result of the parties' inability to comply with their joint

discovery plans or follow the Court's discovery deadlines. *See, e.g.*, Min. Order dated April 13, 2005. Discovery was ultimately completed on November 21, 2005. Throughout this period of discovery, the parties litigated several motions to compel. In particular, Plaintiff's Second Supplemental Motion to Compel, filed on January 20, 2005, discussed each area of contested discovery, set forth Defendant's responses and objections to each request, and provided reasons why Defendant's production was deficient. *See* Pl.'s Second Suppl. Mot. to Compel at 1-22. As part of that Motion to Compel, Walker again explained that he amended his Complaint to add several unexhausted retaliation claims and that a plaintiff need not exhaust their administrative remedies to allege retaliation claims connected to the filing of an underlying EEO charge. *Id.* at 3. Defendant failed to file an Opposition to Walker's Motion to Compel. Accordingly, on February 22, 2005, Magistrate Judge Alan Kay (to whom discovery matters had been referred) issued a Memorandum Order granting Walker's Second Supplemental Motion to Compel. *See* [36] Mem. Order at 1-3 (Feb. 22, 2005).

Following discovery, Defendant filed a Motion for Summary Judgment, which Walker opposed. Defendant also filed a Reply. After the parties completed this briefing, Walker submitted a notice of supplemental authority relating to *Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53 (2006) (relating to claims of retaliation), as to which Defendant filed a response. Accordingly, Defendant's Motion for Summary Judgment is ripe for resolution.

## II.  LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56, a party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See* Fed. R.

Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).   Under the summary judgment

standard, Defendant, as the moving party, bears the "initial responsibility of informing the district

court of the basis for [its] motion, and identifying those portions of the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits which [it]

believe[s] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986).   Plaintiff, in response to Defendant's motion, must "go beyond the

pleadings and by [his] own affidavits, or depositions, answers to interrogatories, and admissions

on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324

(internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the

nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar

summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   To be

material, the factual assertion must be capable of affecting the substantive outcome of the

litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a

reasonable trier-of-fact could find for the nonmoving party.  *Laningham v. U.S. Navy*, 813 F.2d

1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251 (the court must determine

"whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is

merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty*

*Lobby*, 477 U.S. at 249-50 (internal citations omitted).   "Mere allegations or denials in the

adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary

judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996).   The adverse party must

29

do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

Importantly, "[w]hile summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of his obligation to support his allegations by affidavits or other competent evidence showing that there is a genuine issue for trial."  *Morgan v. Fed. Home Loan Mortgage Corp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001) (quoting *Calhoun v. Johnson*, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998) (internal citation omitted), *aff'd*, No. 99-5126, 1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 2000)); *see also Marshall v. James*, 276 F. Supp. 2d 41, 47 (D.D.C. 2003) (special caution "does not eliminate the use of summary judgment in discrimination cases") (citing cases).  "Summary judgment is not a 'disfavored procedural shortcut,' but is an integral procedural tool which promotes the speedy and inexpensive resolution of every case." *Marshall*, 276 F. Supp. 2d at 47 (quoting *Celotex Corp.*, 477 U.S. at 327).  Accordingly, the Court reviews Defendant's Motion for Summary Judgment under a "heightened standard" that reflects "special caution."  *Aka v. Washington Hosp. Ctr.*, 116 F.3d 876, 879 (D.C. Cir. 1997) (internal quotations omitted), *overturned on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc).  Nonetheless, while this special standard is more exacting, it is not inherently preclusive.  Although more circumspect, the Court shall continue to grant a motion for summary judgment in which the nonmoving party has

failed to submit evidence that creates a genuine factual dispute and the moving party is entitled to a judgment as a matter of law.

## III. DISCUSSION

Before reaching the merits of Defendant's Motion for Summary Judgment as to each of Walker's four claims, the Court must first address Defendant's threshold argument that two of Walker's retaliation claims should be dismissed because Walker failed to exhaust his administrative remedies. The Court shall then proceed to individually address each of Walker's claims.

### A.     *Administrative Exhaustion*

Defendant's Motion for Summary Judgment argues that Walker failed to exhaust his administrative remedies with respect to his retaliation claim based on Walker's supervisors having deprived him of overtime work (claim two) and retaliation claim based on Walker's non-selection for an Electronic Industrial Controls Mechanic Supervisor position (claim four).[14] *See* Def.'s Mot. at 24-27. The Court finds that Defendant has waived this argument.

The EEOC has "established detailed procedures for the administrative resolution of discrimination complaints, including a series of time limits for seeking informal adjustment of complaints, filing of formal charges, and appealing agency decisions to the Commission." *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997). For example, aggrieved federal employees must initiate contact with an EEO counselor within 45 days of the date of the matter

___

[14] Defendant does *not* argue that Walker failed to exhaust his administrative remedies with respect to his discrimination and retaliation claim based on his non-selection for the Mechanical Engineering Technician position (claim one) and his retaliation claim based on the rejection of his LDI Program application (claim three).

alleged to be discriminatory or, in the case of a personnel action, within 45 days of the effective

date of the action.  29 C.F.R. § 1614.105(a)(1).  "'Because timely exhaustion of administrative

remedies is a prerequisite to a Title VII action against the federal government,' a court may not

consider a discrimination claim that has not been exhausted in this manner absent a basis for

equitable tolling."  *Steele v. Schafer*, 535 F.3d 689, 693 (D.C. Cir. 2008) (quoting *Stewart v.*

*Ashcroft*, 352 F.3d 422, 426 (D.C. Cir. 2003)).

Defendant's argument focuses on two of Walker's claims of retaliation, not

discrimination.  That distinction is material.  In *Saksenasingh v. Secretary of Education*, the D.C.

Circuit ruled that a lower court could properly assert jurisdiction over a plaintiff's unexhausted

*retaliation* claims even if it ultimately dismissed the plaintiff's claim of discrimination.  126 F.3d

347, 351 (D.C. Cir. 1997).  As support, the Court cited *Nealon v. Stone*, a much-cited Fourth

Circuit case holding that plaintiffs may assert Title VII retaliation claims in federal court without

first exhausting their administrative remedies.  958 F.2d 584, 590 (4th Cir. 1992).  In that case,

the Fourth Circuit joined "[a]ll other circuits that have considered the issue," and explained that

allowing plaintiffs to assert unexhausted retaliation claims is "the inevitable corollary of [the]

'generally accepted principle that the scope of a Title VII lawsuit may extend to any kind of

discrimination like or related to allegations contained in the charge and growing out of such

allegations during the pendency of the case before the Commission.'"  *Id.* (quoting *Hill v. W.*

*Elec. Co.*, 672 F.2d 381, 390 n.6 (4th Cir. 1982) (internal quotations and citation omitted).  The

Fourth Circuit also explained that the rule reflects the practical reality that a plaintiff, "[h]aving

once been retaliated against for filing an administrative charge . . . will naturally be gun shy about

inviting further retaliation by filing a second charge complaining about the first retaliation."  *Id.*

32

Consistent with the D.C. Circuit's *Saksenasingh* holding, courts in this district have previously allowed plaintiffs to advance unexhausted claims of retaliation. *See, e.g.*, *Hunt v. D.C. Dep't of Corr.*, 41 F. Supp. 2d 31, 37 (D.D.C. 1999) ("courts frequently have not required [a] Plaintiff to file a new administrative action with the EEOC in order to exhaust her administrative remedies on [a] retaliation claim"); *Bonds v. Heyman*, 950 F. Supp. 1202, 1208 (D.D.C. 1997) ("a plaintiff may raise [a] retaliation claim for the first time in federal court"). Nevertheless, the vitality of this line of cases has been called into question by the Supreme Court's decision in *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

In *Morgan*, the Supreme Court held that "[d]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges" and that "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.* at 113. Defendant's Motion argues that *Morgan* altered the legal landscape such that Walker's two unexhausted claims of retaliation should be dismissed from this suit (even though *Morgan* had been decided more than two years before Walker's Motions to Amend). *See* Def.'s Mot. at 24-26. Walker reads *Morgan* differently, arguing that the decision "dealt only with the timeliness of the administrative complaints that were made and not with whether the failure to file any administrative claim should be excused." Pl.'s Opp'n at 24.

The D.C. Circuit has not had occasion to adopt either of these divergent views. In *Weber v. Battista*, the D.C. Circuit explained that, in the wake of *Morgan*, "two circuits have considered and reached different conclusions with respect to whether a claim arising after the filing of a formal administrative complaint must be raised with the EEOC . . . before being brought before a district court." 494 F.3d 179, 351 (D.C. Cir. 2007). The Eighth Circuit has held that a plaintiff

33

"need not separately exhaust her administrative remedies with respect to 'subsequent retaliatory acts . . . of a like kind to the retaliatory acts alleged in the EEOC charge, which were specified to be of an ongoing and continuing nature.'" *Id.* (quoting *Wedow v. City of Kansas City*, 442 F.3d 661, 673-74 (8th Cir. 2006)).  The Tenth Circuit reached a different conclusion, holding that a plaintiff must "start anew before the EEOC" before raising in the district court a discrete claim occurring after the filing of an administrative complaint.  *Id.* (citing *Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003)).  The D.C. Circuit declined to adopt either position in *Weber*, however, because the plaintiff in that case had, in fact, exhausted her administrative remedies. *Id.* at 352.

While the Court acknowledges that this issue is an interesting one, the Court need not resolve it in this case because *Morgan* did not upset the well-established rule that administrative exhaustion "is subject to equitable doctrines such as tolling or estoppel."  *Morgan*, 536 U.S. at 113 (citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982) ("We hold that filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling.")).  The *Morgan* Court advised lower courts to "evaluate whether it would be proper to apply such [equitable] doctrines," even though they are to be applied "sparingly." *Id.*

In this case, Walker twice amended his Complaint to add his unexhausted Title VII retaliation claims.  In each instance, Walker acknowledged that he had not exhausted his administrative remedies with respect to these claims, but set forth his argument (citing the cases referenced above) that there is no legal requirement that he do so.  *See* Pl.'s Mot. to Amend at 3-

4; Pl.'s Second Mot. to Amend. at 1.  Defendant did not oppose either motion and, in fact,

submitted a notice to the Court in response to Walker's Second Motion to Amend stating

affirmatively that "Defendant does not oppose Plaintiff's request to amend his Complaint . . ."

Def.'s Resp. to Pl.'s Mot. at 1.  Defendant thereafter failed to file an Answer to either of

Walker's Amended Complaints.

The failure to exhaust administrative remedies, like the statute of limitations, is an

affirmative defense.  *Brown v. Marsh*, 777 F.2d 8, 13 (D.C. Cir. 1985) (citing *Zipes*, 455 U.S. at

393).  Affirmative defenses are governed by Federal Rule of Civil Procedure 8(c), which

provides that "a party must affirmatively state any avoidance or affirmative defense" when

responding to a pleading.  Although Rule 8(c) does not mention waiver or forfeiture as a

consequence of not timely asserting such a defense, the D.C. Circuit has held that "[a] party's

failure to plead an affirmative defense . . . generally 'results in the waiver of that defense and its

*exclusion from the case.*'" *Harris v. Sec'y of the Dep't of Veterans Affairs*, 126 F.3d 339, 343

(D.C. Cir. 1997) (quoting *Dole v. Williams Enters., Inc.*, 876 F.2d 186, 189 (D.C. Cir. 1989)

(emphasis in original)).  The D.C. Circuit has held in no uncertain terms that "Rule 8(c) means

what it says: a party must first raise its affirmative defenses in a responsive pleading before it can

raise them in a dispositive motion." *Id.* at 345.  *See also Smith-Haynie v. District of Columbia*,

155 F.3d 575, 578 (D.C. Cir. 1998) ("an affirmative defense not raised by answer cannot be

raised in dispositive motions that are filed post-answer").

In this case, not only did Defendant fail to raise administrative exhaustion as an

affirmative defense to Walker's First and Second Amended Complaints (which added these two

claims), but Defendant failed entirely to answer Walker's First or Second Amended Complaints

in violation of Federal Rule of Civil Procedure 15(a)(3) ("any required response to an amended pleading must be made within the time remaining to respond to the original pleading or within 10 days after service of the amended pleading, whichever is later").  And, specifically as to the operative complaint in this case – Walker's Second Amended Complaint – Defendant expressly indicated that it did not oppose the assertion of these retaliation claims.  *See* Def.'s Resp. to Pl.'s Mot. at 1.  Under such circumstances, and consistent with Federal Rule of Civil Procedure 8(c) and *Harris*, the Court finds that Defendant has waived its argument that Walker failed to exhaust his administrative remedies as to these two claims.[15]

Finally, the Court agrees with Walker that, even without this waiver, Defendant's argument is subject to judicial estoppel.  *See* Pl.'s Opp'n at 23.  In *State of New Hampshire v. State of Maine*, the Supreme Court set forth the framework for the doctrine of judicial estoppel, explaining that the rule "is intended to prevent 'improper use of judicial machinery,'" 532 U.S. 742, 749 (2001) (quoting *Konstantinidis v. Chen*, 626 F.2d 933, 938 (D.C. Cir. 1980)), and is "'an equitable doctrine invoked by a court at its discretion,'" *id.* at 750 (quoting *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990)).  Although the doctrine is not rigid in its application, the Court explained that three factors are typically present: (1) a party's later position must be clearly inconsistent with its earlier position; (2) whether judicial acceptance of an inconsistent position in a later proceeding would create the perception that the court was misled; and (3) the party

---

[15] The Court is aware of the D.C. Circuit's discussion in *Harris* that described the difference between a "forfeiture" (the failure to make the timely assertion of a right) and a "waiver" (the intentional relinquishment or abandonment of a known right).  The Court finds that Defendant was on notice of Walker's amended complaints and the legal consequences of Walker's assertion of these retaliation claims.  Defendants nevertheless affirmatively did not oppose the addition of the claims.  The Court therefore finds that Defendant waived this argument.

asserting the inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *Id.* at 750-51. In this case, Defendant has clearly shifted from its earlier position that it did not oppose the assertion of these claims in this proceeding. Moreover, each of Walker's Motions to Amend sets forth Walker's legal argument as to why these claims did not require administrative exhaustion, and the Court granted each of his unopposed motions. Allowing Defendant to raise this argument now would not only call into question the propriety of granting Walker's Motions to Amend, but it would also act to the detriment of Walker whose case has been pending since 2002 and who has relied on Defendant's non-opposition to assert these claims in this forum. Defendant's shifting positions would also have wasted party resources (having conducted discovery on issues associated with these claims) and judicial resources (having rendered decisions regarding discovery as to these claims).

The Court therefore declines to dismiss Walker's unexhausted retaliation claims from this action.

### B.      *Walker's Discrimination and Retaliation Claims*

Title VII of the Civil Rights Act prohibits the federal government from discriminating in employment on the grounds of race, 42 U.S.C. § 2000e-16, and from retaliating against employees for engaging in activity protected by Title VII, *id.* § 2000e-3(a). To prove a violation of Title VII, a plaintiff must demonstrate by a preponderance of the evidence that the actions taken by an employer were "more likely than not based on the consideration of impermissible factors." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981) (internal quotation

marks and citation omitted).  Furthermore, a plaintiff may prove his claim with direct evidence,[16]

and absent direct evidence, he may prove his claim using indirect evidence pursuant to the

burden-shifting analysis created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

*Carpenter v. Fed'l Nat'l Mort. Assoc.*, 165 F.3d 69, 72 (D.C. Cir. 1999).

   Where, as here, the record contains no direct evidence of discrimination, it is necessary to

employ the familiar *McDonnell Douglas* tripartite burden-shifting framework.  *Cones v. Shalala*,

199 F.3d 512, 516 (D.C. Cir. 2000) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802).  "Like

claims of discrimination, claims of retaliation are also governed by the *McDonnell Douglas*

burden-shifting scheme."  *Carney v. Am. Univ.*, 151 F.3d 1090, 1094 (D.C. Cir. 1998) (citing

*McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir. 1984)).  Under this paradigm, a plaintiff

has the initial burden of proving by a preponderance of the evidence a prima facie case.

*McDonnell Douglas*, 411 U.S. at 802.  If he succeeds, the burden shifts to the defendant to

articulate some legitimate, non-discriminatory or non-retaliatory reason justifying its conduct.

*Id.*  If the defendant is successful, then "the *McDonnell Douglas* framework – with its

presumptions and burdens – disappear[s], and the sole remaining issue [is] discrimination *vel*

*non*."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000) (internal

citations and quotation marks omitted).

   For a claim alleging discriminatory non-selection for an employment position (as in this

case), the *McDonnell Douglas* prima facie factors are:  "(i) the employee 'belongs to a racial

---

[16] Direct evidence "is evidence that, if believed by the fact finder, proves the particular fact in question *without any need for inference*."  *Brown v. Small*, 437 F. Supp. 2d 125, 130 n. 7 (D.D.C. 2006) (emphasis in original) (citing *Randle v. LaSalle Telecomms., Inc.*, 876 F.2d 563, 569 (7th Cir. 1989)).

minority' or other protected class; (ii) the employee 'applied and was qualified for a job for which the employer was seeking applicants'; (iii) despite the employee's qualifications, the employee 'was rejected'; and (iv) after the rejection, 'the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 493 n.1 (D.C. Cir. 2008) (quoting *McDonnell Douglas*, 411 U.S. at 802). For a claim of retaliation, the prima facie elements are (1) the employee engaged in statutorily protected activity; (2) the employer took an adverse personnel action against him; and (3) a causal connection exists between the two. *Carney*, 151 F.3d at 1095 (citing *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985)).

The D.C. Circuit has clarified that the *McDonnell Douglas* prima facie factors are "almost always irrelevant" and are "largely [an] unnecessary sideshow" *Id.* at 492-93. Where an employer asserts a legitimate, non-discriminatory (or non-retaliatory) reason for its challenged conduct, thereby doing "everything that would be required of [it] if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant." *Brady*, 520 F.3d at 494 (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)). *See also Adeyemi v. D.C.*, 525 F.3d 1222, 1226 (D.C. Cir. 2008) (holding that the prima facie inquiry "is irrelevant when an employer has asserted a legitimate, non-discriminatory reason for an adverse employment action"). "And by the time the district court considers an employer's motion for summary judgment or judgment as a matter of law, the employer ordinarily will have asserted a legitimate, non-discriminatory reason for the challenged decision – for example, through a declaration, deposition, or other testimony from the employer's decisionmaker." *Brady*, 520 F.3d at 493. In such circumstances, a district court's inquiry collapses into a single

question: "[h]as the employee produced sufficient evidence for a reasonable jury to find that the

employer's asserted non-discriminatory [or non-retaliatory] reason was not the actual reason and

that the employer intentionally discriminated against the employee on the basis of race, color,

religion, sex, or national origin?"  *Id.* at 494.

Based on this guidance, the D.C. Circuit has stated in no uncertain terms that a lower

court should not evaluate whether a plaintiff has established a prima facie case where a defendant

sets forth a legitimate, non-discriminatory reason for its conduct: "the district court need not –

*and should not* – decide whether the plaintiff actually made out a prima facie case under

*McDonnell Douglas*."  *Id.* at 495 (emphasis in original).  *See also Adeyemi*, 525 F.3d at 1226 n.1

("the prima facie case is ultimately *irrelevant* here") (emphasis added); *Wiley v. Glassman*, 511

F.3d 161, 156 (D.C. Cir. 2007) ("[g]iven this record [which includes articulated, non-

discriminatory reasons] we 'need not address the Government's contentions that [appellant]

failed to make out a prima facie case'") (quoting *George v. Leavitt*, 407 F.3d 405, 411 (D.C. Cir.

2005)).

Nevertheless, the Supreme Court also advised lower courts in *Reeves v. Sanderson*

*Plumbing Products, Inc.* that "a plaintiff's prima facie case, combined with sufficient evidence to

find that the employer's justification is false, may permit the trier of fact to conclude that the

employer unlawfully discriminated."  530 U.S. 133, 148 (2000).  That is, the Supreme Court

suggested that the evidence used to establish a prima face case could be used to aid a jury's

determination on "the issue of whether the defendant's explanation is pretextual."  *Id.* at 143

(quoting *Burdine*, 450 U.S. at 255 n.10).  *See also Brady*, 520 F.3d at 495 (explaining *Reeves*

requires lower courts to "determin[e] whether summary judgment or judgment as a matter of law

is warranted . . . [by] consider[ing] all relevant evidence presented by the plaintiff and defendant"). Accordingly, because Defendant in this case has asserted legitimate, non-discriminatory and non-retaliatory reasons for its challenged conduct, all of the evidence in the record shall be considered, including that which would be used to establish Walker's prima facie case (but not for the purpose of evaluating whether a prima facie case has been established), to address the ultimate question of discrimination or retaliation *vel non*.

       1.     Non-Selection for Mechanical Engineering Technician Position

As explained above, Walker applied for the Mechanical Engineer Technician Position along with six other individuals. Capozolli reviewed the applications of the eligible candidates and assigned them points relating to six different evaluation criteria. Capozzoli selected Altenbach as a GS-11 technician and Schank as a GS-12 technician, and Walker was not selected.

Defendant has repeatedly proffered legitimate, non-discriminatory and non-retaliatory reasons justifying Capozolli's selection. In particular, Defendant claims that Walker was not among the most qualified applicants for the technician position. *See* Def.'s Mot. at 8; Pl.'s Opp'n, Ex. 33 at 1 (8/28/01 GS-12 Ranking Sheet); *id.*, Ex. 32 at 1 (8/28/01 GS-11 Scoring Sheet). Capozolli also explained that Altenbach and Schank's applications were better organized than Walker's application, and that they spoke more clearly than Walker during Capozolli's interviews with the applicants. Def.'s Mot., Ex. 16 ¶¶ 7-9 (Decl. of D. Capozolli).

Because Defendant has proffered these legitimate, non-discriminatory and non-retaliatory reasons for its non-selection of Walker, *see Brady*, 520 F.3d at 493 (explaining that a legitimate, non-discriminatory reason may be contained in a declaration, deposition, or other testimony from

the employer's decisionmaker), whether Walker has established a prima facie case of discrimination or retaliation is "irrelevant." *Adeyemi*, 525 F.3d at 1226.  Thus, the court's inquiry collapses into the single question of whether Walker has produced sufficient evidence for a reasonable jury to find that Defendant's asserted non-discriminatory and non-retaliatory reasons were not the actual reason for Walker's non-selection, and that the real reason was based on discrimination or retaliation.  *See Brady*, 520 F.3d at 493.

Before considering that question, however, the Court notes that Defendant concedes Walker's prima facie case of discriminatory non-selection, *see* Def.'s Mot. at 33, but argues that Defendant has not established a prima facie case of retaliatory non-selection, *see* Def.'s Mot. at 36-37.  Because the strength of a plaintiff's prima facie case constitutes relevant evidence for determining retaliation *vel non*, *see Reeves*, 530 U.S. at 143, the Court pauses to address Defendant's assertions that Walker cannot state a claim of retaliation because (1) Capozolli and Verde had no knowledge of Walker's prior EEO activity, and (2) there is no temporal proximity, and therefore no causal connection, between Walker's EEO activity and his non-selection.  Def.'s Mot. at 36-37.

Defendant's first assertion concerning Capozolli and Verde's knowledge is contradicted by evidence in the record from which a jury could find that both individuals knew of Walker's EEO activities.  Capozolli acknowledged reading the 1998 Washington Post article that described Walker's complaints against Defendant and Judge Green's hearing related to the same. *See* Pl.'s Opp'n, Ex. 17 at 38:3 - 38:15 (". . . I seem to recall an article . . . Whether I read it kind of like this [a printed copy], as an e-mail or whether I just picked up the paper and read it, I can't even remember anymore").  Verde testified that he was aware of Walker's discrimination

42

complaints against the Navy and of the parties' settlement related thereto.  *See, e.g.*, Pl.'s Opp'n, Ex. 18 at 27:9 - 27: 11 ("Q: So you are aware that he [Walker] had a case of some kind against the Navy?  A: Of some kind, yes, sir."); *id.* at 28:20 - 29:2 ("Q: Did you hearing anything to the effect of Mr. Walker's case against the Navy being settled?  A: I heard within the same context that something was settled, but of the specifics, I knew nothing").

Defendant's second assertion is legally inaccurate.  While an employee may establish a causal connection between his EEO activities and an alleged retaliatory event by showing close temporal proximity between the two, *see, e.g.*, *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001), that is not the exclusive method of showing a casual connection.  *See Forman v. Small*, 271 F.3d 285, 299 (D.C. Cir. 2001) (requiring the Plaintiff to establish facts "adequate to permit an inference of retaliatory motive," not facts that establish temporal proximity); *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 178 (3d. Cir. 1997) ("It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case.").  Walker's proffered evidence may raise an inference of causation by showing a "pattern of antagonism" following his EEO-protected activities.  *See Hamilton v. Paulson*, 542 F. Supp. 2d 37, 60-61 (D.D.C. 2008) (quoting *Kachmar*, 109 F.3d at 177).  In this case, Walker has an extensive history of EEO-related activities that resulted in Judge Greene excoriating Defendant and threatening to jail the decisionmakers' commanding officer.  Taking into account these facts as well as the proffered evidence discussed below, the Court finds that there is sufficient evidence in the record from which a reasonable jury could find a causal connection related to Walker's retaliatory non-selection claim.

Turning to the ultimate question of discrimination and retaliation *vel non*, Defendant

argues that the Court should not "second-guess" Capozolli's selection decisions because "the undisputed facts demonstrate that [Walker] had less HVAC-specific experience than Altenbach and less engineering and construction contract experience than Schank." Def.'s Mot. at 35 (internal citation omitted). Defendant argues that the only relevant inquiry is whether Capozolli "honestly believe[d] in the reason [he] offers," Def.'s Mot. at 35 (quoting *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)), and argues that "[i]t is not the role of the court (or a jury) to sit as 'super-personnel department[s] that reexamine an entity's business decisions.'" Def.'s Reply at 6 (quoting *Stewart v. Ashcroft*, 352 F.3d 422, 429 (D.C. Cir. 2003) (citation omitted)).

Although a plaintiff may not successfully demonstrate pretext by referencing the relative qualifications of the applicants unless the plaintiff was "*significantly* better qualified for the job" than the applicants that were chosen, *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006), Walker is *not* relying on the applicants' relative qualifications to demonstrate pretext in this case. Rather, Walker "'seek[s] to expose other flaws in [Defendant's] explanation.'" *See* Pl.'s Opp'n at 25 (quoting *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1295 (D.C. Cir. 1998) (en banc)). Such evidence may be used to demonstrate "'that the nondiscriminatory explanation the defendant proffered for its decision was false,'" or is otherwise unpersuasive (*i.e.*, pretextual). *Czekalski v. Peters*, 475 F.3d 360, 366 (D.C. Cir. 2007) (quoting *Lathram*, 336 F.3d at 1089)).

The Court finds that Walker has proffered sufficient evidence in the record to cast doubts about Defendant's proffered explanation (*i.e.*, whether it is pretextual), and whether Defendant's true reason for Walker's non-selection was discrimination or retaliation. For example, there is conflicting evidence in the record concerning the interviews Capozolli conducted as a part of his

evaluation process.  Capozolli claims that he interviewed Walker by phone, Pl.'s Opp'n, Ex. 17 at 49:5 - 49:12 (Depo. Tr. of Capozolli), and Walker denies that Capozolli ever interviewed him. Pl.'s Opp'n, Ex. 1 ¶ 15 (Affid. of S. Walker).  Although Capozolli testified that he might have ranked the candidates *before* interviewing them, *id.* at 46:1 - 46: 5, there is evidence in the record suggesting that he took the interviews into account during his evaluations and scored Walker lower as a result.  *See* Def.'s Mot.,  Ex. 16 ¶¶ 6, 7 (Decl. of D. Capozolli) (indicating that Schank and Altenbach received 3 points for criteria six because they "spoke clearly during [their] telephone conversation[s]"); *id.*, Ex. 6 at 96:3 - 96:9 (Depo. Tr. of D. Capozzoli) (testifying that he awarded Walker 2 points because he "didn't speak very clearly" and was "just kind of hard to understand").  Capozolli also possessed no recollection of what he believes he may have discussed with Walker, *see* Pl.'s Opp'n, Ex. 17 at 67:15 - 67:18, even though he also explained that he "had to ask [Walker] to repeat his statements several times," *id.*, Ex. 16 ¶ 9 (Decl. of D. Capozolli).

Defendant argues that these factual disputes are "immaterial," Def.'s Reply at 9, but that argument is unpersuasive for both factual and legal reasons.  There is substantial evidence in the record that the interviews influenced Capozolli's scoring.  Capozolli testified that the interviews were meant to allow the applicants to clarify portions of their resumes, *see* Pl.'s Opp'n, Ex. 17 at 45:18 - 45:21 (Depo. Tr. of D. Capozolli), but that portions of Walker's resume were unclear. *See* Def.'s Resp. Stmt. ¶ 1(j).  Even Defendant's reasons for why Walker's application were unclear are subject to dispute.  Defendant asserts that Walker's application contained "grammatical errors" (which it does not identify) and "the description of his knowledge, skills, and abilities did not correspond to the evaluation factors in the vacancy announcement."  Def.'s

Stmt. ¶ 32.  Walker disputes that his application contained any more grammatical errors than any of the other applications for the position.  *See* Pl.'s Resp. Stmt. ¶ 32.  Walker also disputes that the organization of his application was problematic because Schank's application was not organized by the six evaluation criteria, and Schank tied two others for the highest score.  *Id.* Paradoxically, Capozolli also described Schank's application as "very organized."  Def.'s Mot., Ex. 16 ¶ 7 (Decl. of D. Capozolli).  In any event, without the ability to clarify his resume as the other candidates may have done, Walker would have been at a severe disadvantage in the scoring of his application even though Defendant's Merit Promotion Procedures Manual requires that "equity should be observed" during the evaluation process.  Pl.'s Opp'n, Ex. 25 at 24 (12/28/93 Merit Promotion Procedures Manual).

     Although Capozolli claimed not to know Walker's race or EEO-related activities during the evaluation process, there is also substantial evidence to the contrary.  For example, during Capozolli's deposition in this case, he testified that when he spoke to Walker on the telephone he "could tell from his [Walker's] voice that he was a black guy."  *Id.*, Ex. 17 at 54:13 - 54:15 (Decl. of D. Capozolli).  Capozolli also acknowledged reading the 1998 Washington Post article that described Walker's allegations of race discrimination, even though he denied recalling the picture of Walker in the article.  *See* Pl.'s Opp'n, Ex. 17 at 38:3 - 38:15 (". . . I seem to recall an article, I don't seem to recall a picture in the article.  Whether I read it kind of like this [a printed copy], as an e-mail or whether I just picked up the paper and read it, I can't even remember anymore").

     These inconsistencies in the record, and the corresponding doubts raised as to the credibility of Capozzoli's explanation for his selection decision, could be regarded by a

reasonable jury as pretext for a discriminatory or retaliatory motive.  *See Anderson v. Zubieta*, 180 F.3d 329, 345 (D.C. Cir. 1999) ("[t]he question is whether the plaintiffs have cast such doubt on [the defendant's] credibility that a reasonable juror could regard it as pretext and infer a discriminatory motive"); *Sw. Merchandising Corp. v. NLRB*, 53 F.3d 1334, 1344 (D.C. Cir. 1995) ("vague and shifting testimony" could allow a reasonable jury to "infer that the company's explanations were pretextual and shielded an illicit motive").  *See also Cones v. Shalala*, 199 F.3d 512, 519 (D.C. Cir. 2000) (holding that a jury could have concluded that the agency's explanation for not promoting the African American plaintiff was inconsistent with other evidence that it had promoted three white employees and thus a pretext for discrimination). Further, a jury could also find that Capozolli failed to comply with the provision in Defendant's Merit Promotion Procedures Manual concerning equity in the evaluation process.  The failure to follow an employer's established procedures, particularly those designed to ensure fairness in a selection process, may be evidence of pretext.  *See Salazar v. Wash. Metro. Area Transit Auth.*, 401 F.3d 504, 508-09 (D.C. Cir. 2005) ("a jury could conclude that [the defendant] failed to provide a fairly administered selection process and that its claim to the contrary is pretextual") (internal quotations omitted); *Lathram v. Snow*, 336 F.3d 1085, 1093-94 (D.C. Cir. 2003) (holding that a jury could draw an inference of discrimination where an agency departed from its normal process without justification).

In addition to these and other factual disputes that preclude entry of summary judgment, the evidence that Capozolli had knowledge of Walker's race and EEO-related activities, the inconsistencies in the explanation of his evaluation process, and his failure to follow Defendant's evaluation procedure that requires equity in the evaluation process (if the jury were to find that

Walker was not, in fact, interviewed by Capozolli), if credited, are sufficient for a reasonable jury

to find that Walker was not selected because of racial discrimination or retaliation for his EEO-

related activities.[17]   Accordingly, the Court shall deny Defendant's Motion for Summary

Judgment as to Walker's claims of discrimination and retaliation based on his non-selection for

the Mechanical Engineering Technician position.

       2.    <u>Overtime</u>

      As explained above, Walker claims that his supervisors, Loften and Compofelice,

retaliated against him by rarely allowing him to perform overtime work.  Defendant, in contrast,

argues that Loften and Compofelice had legitimate, non-discriminatory reasons for not allowing

Walker to work more overtime:  (1) Walker's maintenance department did not work on projects

large enough to necessitate overtime work, and (2) Defendant's union agreement prohibits the

assignment of overtime to supervisors for work normally performed by union members if those

employees are available.  *Id.* at 31-32.

      Because Defendant has proffered these legitimate, non-retaliatory reasons, whether

Walker has established a prima facie case of retaliation is "irrelevant."  *Adeyemi*, 525 F.3d at

1226.  The court's inquiry therefore collapses into the single question of whether Walker has

produced sufficient evidence for a reasonable jury to find that Defendant's asserted  non-

retaliatory reasons were not the actual reason for Walker's having not received more overtime

---

[17] The Court notes that EEO-protected activities encompass more than just filing an EEO complaint.  "An activity is 'protected' for the purposes of a retaliation claim 'if it involves opposing alleged discriminatory treatment by the employer or participating in legal efforts against the alleged treatment.'"  *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 91 (D.D.C. 2006) (quoting *Coleman v. Potomac Elec. Power Co.*, 422 F. Supp. 2d 209, 212-13 (D.D.C. 2006)).

work, and that the real reason was based on retaliatory animus.  *See Brady*, 520 F.3d at 493.

As with Walker's non-selection claim above, Defendant argues that Walker cannot establish a prima facie case of retaliation regarding denial of overtime.  Because the strength of Walker's prima facie case is relevant to the ultimate question of retaliation *vel non*, the Court considers Defendant's arguments which are, in any event, wholly without merit.

First, Defendant argues that the denial of overtime is not an adverse personnel action but rather a reflection of a widespread policy against overtime that has been implemented at NPWC. *See* Def.'s Mot. at 29.  This argument fails because Walker is not challenging NPWC's overtime policy on its face, but rather how Walker's supervisors applied their overtime policies to him, individually.  *See* Pl.'s Opp'n at 38 ("Defendant . . . misstates the essence of Walker's claim.  He contends that he was essentially denied the opportunity for overtime work by Loften and Compofelice, not just for supervisory work, but even for substantive hands-on emergency and call-back work that other supervisors got . . . .").[18]  In any event, an action is adverse if it "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006).  Because the denial of overtime work would result in the denial of overtime pay, *see* Def.'s Stmt. ¶ 49, the Court finds that denial of overtime work in retaliation for EEO-related activities clearly constitutes an adverse action.

Second, Defendant argues that "Plaintiff cannot establish that he [sic] treated differently from similarly-situated employees outside his protected class because he worked equal to, or

---

[18] In fact, Loften testified that he was not even familiar with the policy to which Defendant's are referring.  *See* Pl.'s Opp'n, Ex. 14 at 42:6 - 42:22 (Depo. Tr. of A. Loften) ("Q: Do you recognize this [instruction?] A: Not really.  Q: You've never seen this [instruction] before?  A: I can't recall.").

more than, the other Maintenance Supervisors in Code 530 [his maintenance department]." *Id.* at 30. This argument is truly puzzling because Walker is asserting a claim based on retaliation for his EEO activities, not one based on racial discrimination. Nevertheless, the D.C. Circuit has expressly held that even in cases of disparate impact claims, a showing that others outside the plaintiff's protected class were treated differently is *not* a necessary part of a plaintiff's prima facie showing:

> the District Court held that, 'to establish a prima facie case of disparate treatment discrimination, the plaintiff must show [*inter alia*] that she was treated differently than similarly situated employees. This is not a correct statement of the law. We have made clear that a plaintiff makes out a prima facie case of disparate-treatment discrimination by establishing that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. One method by which a plaintiff can satisfy the third prong of this test is by demonstrating that she was treated differently from similarly situated employees who are not part of the protected class.

*George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005) (internal citations and punctuation omitted). To the extent Defendant may have intended to focus this argument on the question of retaliation *vel non*, the argument is also unpersuasive because a plaintiff may show retaliatory motivations by identifying inconsistencies in the employer's proffered justification for its conduct, its general treatment of employees pursuing EEO-related activites, or any number of other methods that do not relate to the treatment of employees outside of a plaintiff's protected class. *Cf. Brady*, 520 F.3d at 495 n. 3

Having disposed of Defendant's prima facie challenge to Walker's retaliation claim, the Court turns now to considering whether a reasonable jury could find from the evidence in the record that Defendant's two proffered legitimate, non-retaliatory reasons for not assigning work

to Walker are pretextual.  The first reason – that Walker's maintenance department did not work

projects large enough to necessitate overtime work – is contradicted by various evidence in the

record.  For example, Compofelice had 351 hours of overtime for activities such as "snow

removal," "power wash planters," and "replacing light fixtures," that Defendant does not purport

to have been associated with large work projects.  Moreover, there are substantial other

opportunities for overtime work that appear to have nothing to do with large projects.  For

example, there was a "call-back" list for emergency service calls that constituted overtime work.

*See* Pl.'s Stmt. ¶ 2(d).  That list, as it pertained to HVAC problems, allowed Compofelice and

Loften, as well as persons who worked for Walker, to obtain overtime for HVAC problems, but

not Walker himself.  *Id.*  The lists for plumbing and medical gas problems also allowed Walker's

subordinates to obtain overtime work, but not Walker himself.  In addition, there is evidence that

employees (including Walker's subordinates) were approved to perform operating room

renovation overtime work, but Walker was not among them.  *Id.* ¶ 4(h).

The same analysis applies to Defendant's second proffered reason that "Defendant's

union agreement . . . prohibits the assignment of overtime to supervisors for work normally

performed by union members if those employees are available."  Def.'s Mot. at 32.  Compofelice

himself had billed overtime hours for projects described as "snow removal," "power wash

planters," and "replacing light fixtures."  *Id.*  Capozolli also testified that the person who was

first called for emergency electrical problems was William Felix, a supervisor, who performed

the work himself (purportedly because he lived so close to the facility).

There is also substantial evidence in the record from which a jury could infer that Loften

and Compofelice operated with a retaliatory animus toward Walker.  For example, Defendant

does not dispute that Loften told Walker, prior to a reduction in workforce that resulted in

Walker's termination, that

> he was glad he wouldn't have to see Walker anymore, that Walker shouldn't have
> been a Maintenance Supervisor, that the only way he could get advances was
> through the court system, and that if it was up to Loften, Walker would be sent
> back to Mississippi.

Pl.'s Stmt. ¶ 2(k); Def.'s Resp. Stmt. ¶ 2(k) (stating only that Loften made these statements after

he no longer was supervising Walker).  Defendant also does not dispute that Compofelice

maintained a notebook that he used to document Walker's use of leave (but no other employees),

even though Walker never exceeded his annual leave.  *Id.* ¶ 2(l); Def.'s Resp. Stmt. ¶ 2(l) (stating

this fact is irrelevant and/or does not constitute an adverse employment action).  There is also

evidence in the record that Loften and Compofelice treated Walker differently than other

supervisors, as described in the declarations of several individuals who were employed in

Walker's Maintenance Department.  Such evidence is highly probative of pretext.  *Czekalski*, 475

F.3d at 363 ("[e]vidence of discriminatory statements or attitudes on the part of the employer" is

one way a plaintiff may show that the employer made an adverse employment decision for a

retaliatory reason).

Defendant's pleadings largely fail to address this evidence and simply argue that some of

the evidence is subject to a different interpretation.  *See, e.g.*, Def.'s Reply at 11 (acknowledging

that Compofelice did, in fact, circumvent Walker and speak directly to Walker's subordinates,

but he did so "only under limited circumstances"); Def.'s Reply at 17 (acknowledging the

substantial overtime hours accrued for other supervisors but explaining that "the number of

overtime hours varies [] because each supervisor had different responsibilities, thus, for Plaintiff

to compare himself with the others is not meaningful"). Defendant's conflicting interpretation of the evidence in the record underscores why summary judgment is inappropriate on this claim.[19]

In addition to these and other factual disputes that preclude entry of summary judgment, the evidence in the record from which a jury could infer Compofelice and Loften's retaliatory animus, as well as the evidence in the record from which a jury could find that Defendant's proffered reasons for its conduct are pretextual, if credited, is sufficient for a reasonable jury to find that Walker was denied overtime work based on retaliation for his EEO-related activities. Accordingly, the Court shall deny Defendant's Motion for Summary Judgment as to Walker's claim of retaliation based on the denial of overtime work by Compofelice and Loften.

### 3.   Leadership Development Initiative Program

As explained above, Walker claims that he was retaliated against when his application for Defendant's LDI Program was rejected. Walker does not dispute that his application was incomplete because it was missing a signed Verification of Eligibility form, and that only complete applications would be accepted. Walker nevertheless argues that his failure to submit a signed form was not his fault.

Defendant argues that Walker's application was rejected for the legitimate, non-retaliatory reason that it was incomplete. *See* Def.'s Mot. at 31. The LDI Program Handbook sets forth Defendant's policy that late or incomplete applications are not considered. *See* Pl.'s Opp'n, Ex. 43 at B-3 (LDI Program Handbook). Heckathorn, the individual responsible for

---

[19] Defendant argues that the five declarations from employees in Walker's maintenance department are inadmissible. *See* Def.'s Reply at 11-15. Because there is sufficient evidence in the record that raises an inference of retaliation even without considering the admissibility of these declarations, the Court declines to address Defendant's argument at this time. Defendant may raise this argument in a Motion *in Limine* pursuant to a schedule to be set by the Court.

reviewing the LDI Program applications, stated that, at the time he reviewed the LDI Program applications, he did not have knowledge of Walker's EEO-protected activities. *See* Def. Mot., Ex. 17 at 54 (EEO Affidavit of L. Heckathorn). After discovering Walker's incomplete application, Heckathorn sought guidance from Wenzel as to whether he could accept Walker's application. *Id.* ¶ 47. Wenzel explained that Altenbach's application was denied the previous year because he failed to include a signed Verification of Eligibility form. *Id.* Wenzel confirmed that "[i]t is an automatic reject if something is missing from the [LDI] package" and that "[Wenzel has] not [previously] extended the time to allow an applicant to obtain [a] signature on the verification [form]. There are no extensions." *Id.* at 2-3. Based on the explicit written policy in the LDI Program Handbook, as well as the guidance from Wenzel, Heckathorn rejected Walker's application for the LDI Program as incomplete.

Because Defendant has proffered this legitimate, non-retaliatory explanation for the rejection of Walker's application, whether Walker is actually able to establish a prima facie case of retaliation is not dispositive. *Adeyemi*, 525 F.3d at 1226. Nevertheless, the court notes, as it has above, that the strength of Walker's prima facie case constitutes evidence that is relevant to the ultimate inquiry of retaliation *vel non*. *See Brady*, 520 F.3d at 493. Accordingly, the Court considers Defendant's two arguments as to why Walker has not established a prima facie case of retaliation.

A plaintiff establishes a prima facie claim of retaliation by showing that (1) the employee engaged in statutorily protected activity; (2) the employer took an adverse personnel action against him; and (3) a causal connection exists between the two. *Carney*, 151 F.3d at 1095 (citing *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985)). Defendant first argues that the

54

denial of Walker's LDI Program application was not an adverse personnel action because participation in the LDI Program does not result in any tangible employment benefit.  *See* Def.'s Mot. at 29.  This argument is unpersuasive.  An action is adverse if it "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006).  The D.C. Circuit has expressly recognized that an employee suffers an adverse employment action if he experiences a consequence that affects his "future employment opportunities" or "opportunity for future advancement." *Wiley v. Glassman*, 511 F.3d 151, 161 (D.C. Cir. 2007).  In this case, graduates of the LDI Program are placed on a Register of Graduates that is used as a resource to fill open positions when they become available.  *See* Pl.'s Opp'n, Ex. 43 at 12 (LDI Program Handbook) (explaining that the Register is "used by local activities as a source for candidates when filling covered positions").  The LDI Program also provides participants with "formal classroom training, special assignments and tasks, job swaps, and rotational assignments, specific-development projects, and . . . off-duty activities" which employees may not otherwise be entitled to receive.  *Id.* at A-4.  Based on this evidence, the Court finds that Walker has proffered sufficient evidence that rejection from the LDI Program constitutes as adverse action.

Defendant's second and more persuasive argument is that Walker "has failed to demonstrate what the causal connection is between his prior EEO activity and Heckathorn's denial of his [LDI Program] application."  Def.'s Reply at 20.  The Court finds that Defendant is correct that there is no evidence in the record to support this causal link.  Heckathorn stated that, at the time he reviewed the LDI Program applications, he did not have knowledge of Walker's EEO-protected activities.  *See* Def. Mot., Ex. 17 at 54 (EEO Affidavit of L. Heckathorn).

55

Although Wenzel apparently knew of Walker's EEO-protected activities, Walker's application was subject to rejection based on the written policy in the LDI Program Handbook and Defendant's prior application of that policy.  Even though Wenzel told Heckathorn about Walker's EEO-protected activities, he did so *after* Heckathorn had already reviewed Walker's application and determined it to be incomplete.  Moreover, Wenzel explained that no exceptions to the written policy had previously been allowed.  These facts are unrebutted by any conflicting evidence in the record.

Similarly, the Court finds that there is no evidence in the record to support a causal connection between Walker's failure to obtain a signed Verification of Eligibility Form and the actions of one or more persons in Defendant's human resources offices.  As discussed in further detail below (in the context of whether a reasonable jury could find sufficient evidence to support a retaliatory motive), Walker's suggestion that someone in a human resources office retaliated against him, *see* Pl.'s Opp'n at 41-42, is based only on speculation because there is no evidence that anyone prevented Walker from obtaining a signed Verification of Eligibility form. Accordingly, the Court agrees with Defendant that Walker has failed to establish a causal connection between an adverse action and his EEO-related activities.

Mindful of the D.C. Circuit's guidance that the dispositive question for a claim of retaliation is not whether a plaintiff can state a prima facie case but rather whether there is sufficient evidence in the record to raise an inference of retaliation, the Court proceeds to address Walker's two arguments that such record evidence exists:  (1) Wenzel had knowledge of Walker's prior EEO-related activities and conveyed the same to Heckathorn, and (2) unidentified persons working in one or more of Defendant's human resources offices took one or more

unspecified actions to prevent Walker from obtaining a signed Verification of Eligibility form, apparently because some employees in one or more of Defendant's human resource offices had knowledge of Walker's EEO activities. *Id.* The Court finds that neither of these arguments relies on evidence that is sufficient to raise an inference of discrimination.

First, Walker is correct that Heckathorn learned of Walker's EEO activities from Wenzel. Nevertheless, Heckathorn learned this information *after* he had already made the determination that Walker's application was incomplete. *See* Def. Mot., Ex. 17 at 54 (EEO Affidavit of L. Heckathorn). Moreover, that fact, standing alone, is almost entirely irrelevant to Defendant's explanation for why Walker's application was rejected. The LDI Program handbook specifically states that incomplete applications are not accepted for consideration, and Heckathorn complied with that policy. *See* Pl.'s Opp'n, Ex. 43 at B-3 (LDI Program Handbook). Not only is there no evidence that Heckathorn applied this rule differently as to Walker's application, but there is substantial evidence of just the opposite. The same rule was also used to reject Altenbach's application when he submitted an incomplete application. Wenzel stated that "[i]t is an automatic reject if something is missing from the [LDI] package" and that "[Wenzel has] not extended the time to allow an applicant to obtain [a] signature on the verification [form]. There are no extensions." Pl.'s Opp'n, Ex. 45 at 2 (EEO Affid. of C. Wenzel). Without more, a reasonable jury could not find that Walker was retaliated against when Heckathorn rejected his LDI Program application pursuant to a policy that was consistently and neutrally applied, without exception. *See Stevens v. Nat'l R.R. Passenger Corp.*, 275 Fed. App'x 14, 15 (D.C. Cir. 2008) (affirming district court's entry of summary judgment for the defendant where the plaintiff's only evidence of retaliation was a statement by one of her supervisors, where evidence of pretext was

57

otherwise absent from the record).

Second, Walker explains that "[t]hose in the Human Resources Offices were aware of Walker's prior discrimination case," and that "one of Walker's prior discrimination complaints had involved the scoring of his application by Human Resources."  Pl.'s Opp'n at 41. Walker then describes his efforts to obtain a signed verification form, blaming unspecified others for the "handling" of his application, but failing to identify who he believes retaliated against him and how they did so.  *Id.* at 41-42.  Although Walker references his conversation with Francis Meyers, a personnel assistant at the Bethesda Satellite Office of the Human Resources Office, she was unaware of Walker's EEO activity at the time she met with Walker, *see* Pl.'s Opp'n, Ex. 49 at 1 (EEO Affidavit of F. Myers) and, in any event, Walker's opposition does not argue that she retaliated against him.  *See* Pl.'s Opp'n at 41-42.

The Court finds that Walker's narrative concerning Defendant's human resources offices is insufficient to raise an inference of retaliation.  Walker must rely on evidence in the record, not his speculation as to what could have transpired.  *See Montgomery v. Chao*, 2008 U.S. App. LEXIS 23909 at *13 (D.C. Cir. Nov. 14, 2008) ("[t]he possibility that a jury might speculate in the plaintiff's favor . . . is simply insufficient to defeat summary judgment"); *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006) ("[t]o conclude that discriminatory animus motivated [the challenged conduct] is to go far beyond reasonable inference and into the realm of unfettered speculation").  Because Walker has provided no evidentiary basis to find that an individual working in human resources prevented him from obtaining a signed form based on a retaliatory animus, a jury would be left to speculate (as Walker has) about what happened to his Verification of Eligibility form.  Such speculation is insufficient to defeat summary judgment.

In short, Walker argues that the evidence in the record raises an inference of retaliation based on evidence that Heckathorn learned of Walker's prior EEO activities after determining that Walker's application was incomplete, and Walker's speculation that someone in one of Defendant's human resources offices acted in some way to prevent Walker from obtaining a signed Verification of Eligibility form, even though Walker cannot establish a causal connection between the rejection of his LDI Program application and his EEO activities (and, therefore, cannot establish a prima facie showing of retaliation), and cannot rebut the evidence that Defendant applied a neutral written policy that has been applied the same way in the past, without exception.  The Court finds that a reasonable jury, based on this evidence, could not infer that Walker's LDI Program application was rejected based on retaliation for his EEO-related activities.  Accordingly, the Court shall grant Defendant's Motion for Summary Judgment on this claim.

4.      Reduction in Workforce / Non-Selection for Electronic Industrial Controls Mechanic Supervisor Position

As explained above, Walker applied for the Electronic Industrial Controls Mechanic Supervisor Position and was considered along with four other candidates for the position. Capozolli and Walters reviewed the applications for each candidate, rating them individually and then ranking them with their combined scores.  John Presley received the highest score with 38 points and Walker received the lowest score with 30 points.  Capozolli and Andrews selected Presley for the position.

Defendant argues that Walker was not selected for the legitimate, non-retaliatory reason that he was not the most qualified candidate.  *See* Def.'s Reply at 22 ("a panel rated and ranked

qualified candidates, and selected the highest rated applicant").  Capozolli testified that this

position was most appropriate for someone who had extensive experience working with utilities.

Pl.'s Opp'n, Ex. 17 at 88:14 - 88:20 (Depo. Tr. of D. Capozolli).  As Walker concedes, Presley

worked as a Utility Systems Operator for most of his career.  *See* Pl.'s Stmt. ¶ 7(c).  Capozolli

did not believe Walker was qualified for the position based on his background.  *See* Pl.'s Opp'n,

Ex. 17 at 88:11 - 88:12 (Depo. Tr. of D. Capozolli).[20]

Walker argues that a jury may find that he was retaliated against because Capozolli knew

about Walker's EEO-related activities.  According to Walker, Capozolli also chose Presley based

solely on his temporary detail in the management position, and that Defendant's Merit Promotion

Program prohibits reliance on temporary positions as a consideration during promotion

evaluations.[21]  Pl.'s Opp'n at 44.

The Court agrees with Defendant that this evidence is insufficient to raise an inference of

retaliation.  As an initial matter, Walker misstates the evidence.  Walker fails to cite to any

portion of the record that would allow a jury to find that Capozolli and Walters made their

selection decision for the "sole" reason that Presley was temporarily in the management position.

In addition, Walker also has not shown that he was more significantly better qualified for the

---

[20] Defendant also argues that "[t]here is no basis in fact that Plaintiff was treated
differently than any other employee affected by the RIF."  Def.'s Mot. at 30.  Because Walker's
claim relates to his non-selection following the RIF, and not the RIF itself, this argument is
misguided.

[21] Walker also quotes Capozolli as stating that "you don't have to be a high voltage
electrician to manage high voltage electricians; you just need to have a background in that," and
argues that this statement is inconsistent with Capozolli's other testimony during his deposition.
*See* Pl.'s Opp'n at 45.  Walker relies on a nonexistent page in the record submitted to the Court.
This statement is, in any event, irrelevant based on the discussion in the text above.

position than Presley.  To raise a retaliatory inference, the D.C. Circuit has explained that the

"[t]he qualifications gap [between the plaintiff and other applicants] must be 'great enough to be

inherently indicative of discrimination.'" *Adeyemi*, 525 F.3d at 1227 (quoting *Jackson v.*

*Gonzales*, 496 F.3d 703, 707 (D.C. Cir. 2007)).  Such a large gap between the relative

qualifications of the applicants allows a fact-finder to "legitimately infer that the employer

consciously selected a less-qualified candidate – something that employers do not usually do,

unless some other strong consideration, such as discrimination, enters the picture."  *Id.*

Moreover, a plaintiff's subjective assessment of his own record is largely irrelevant.  *See*

*Waterhouse v. D.C.*, 124 F. Supp. 2d 1, 7 (D.D.C. 2000) ("[P]laintiff's perception of himself, and

of his work performance, is not relevant.  It is the perception of the decisionmaker which is

relevant.") (internal citation and quotation marks omitted), *aff'd*, 298 F.3d 989 (D.C. Cir. 2002);

*Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (explaining that the

relevant inquiry concerning the relative qualifications of candidates must focus on whether the

panel "honestly believed in the reasons [it] offer[ed] for [the] selection decision").

    In this case, Walker fails to explain why Capozolli and Walter's assessments of the

applicants rated ahead of Walker were disingenuous, let alone wrong.  In fact, Walker fails to

even address his own and the other applicants' qualifications beyond raising the "evidence"

described above concerning Presley's record.  Without more, there is insufficient evidence in the

record from which a jury could find that Walker was retaliated against when Capozolli and

Walters failed to select him for the Electronic Industrial Controls Mechanic Supervisor position.

Accordingly, the Court shall grant Defendant's Motion for Summary Judgment on this claim.

## IV.  CONCLUSION

For the reasons set forth above, the Court shall GRANT-IN-PART Defendant's Motion

for Summary Judgment as to Walker's retaliation claims based on the Leadership Development

Initiative Program and non-selection for the Electronic Industrial Controls Mechanic Supervisor

position (claims 3 and 4), and DENY-IN-PART Defendant's Motion for Summary Judgment as

to Walker's discrimination and retaliation claim based on his non-selection for the Mechanical

Engineering Technician position and retaliation claim based on Walker's supervisors having

deprived him of overtime work (claims 1 and 2).  An appropriate Order accompanies this

Memorandum Opinion.

Date:   December 15, 2008


                                                    _/s/_____
                                                    COLLEEN KOLLAR-KOTELLY
                                                    United States District Judge